## UNITED STATES v. KERR.
### No. 6928.

Circuit Court of Appeals, Ninth Circuit.
Nov. 14, 1932.

George Neuner, U. S. Atty., and Liby Stipp, Asst. U. S. Atty., both of Portland, Or.

J. K. Carson, Jr., and Johnston Wilson, both of Portland, Or., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

NETERER, District Judge.

From a judgment after denial of a motion for directed verdict because (a) no disagreement existed on the claim made by the plaintiff for benefits under the policy sued on, and (b) that there is no evidence to show total and permanent disability at any time from date of discharge, or at any other time, appeal is taken. The action was commenced upon a war risk insurance policy in the amount of $5,000. During the trial the court permitted amendment of the plaintiff upon automatic war risk insurance pursuant to the laws of the United States.

It is undisputed that appellee, enlisted and in service, September 4, 1917, while stationed at Fort Schafter, received an injury to his knee and was discharged on the 28th day of June, 1918, on a surgeon's certificate of disability. He paid no premiums, and claims benefit of the automatic insurance as provided by the War Risk Insurance Act Oct. 6, 1917 (40 Stat. 398), as amended by Act Dec. 24, 1919 (41 Stat. 371). As to disagreement, section 19 of the World War Veterans' Act 1924, as amended (38 USCA § 445), so far as pertinent, provides: "The term 'claim' as used in this section, means any writing which alleges permanent and total disability at a time when the contract of insurance was in force, or which uses words showing an intention to claim insurance benefits and the term 'disagreement' means a denial of the claim by the director."

Prior to commencing this action, claim was made to the United States Veterans' Bureau for all financial benefits under his policy of war risk insurance which was in the sum of $5,000, on account of total and permanent disability existing prior to or at the time of his discharge from the service on account of physicial disability, giving the company, M, Second United States Infantry, and "while serving in the United States Army,

in September, 1919, and engaged in constructing a trench, was injured, from which injury he never recovered"; stating that this occurred at Fort Schafter, Honolulu, T. H. He likewise stated that he was taken to Letterman General Hospital at the Presidio, San Francisco, Cal.; that at discharge his health was poor; that he has a further injury, to wit, deafness caused by explosion of a rock—all this in line of duty.

To this claim, the "Manager of the United States Veterans Bureau, Portland, Oregon," made a response, among other things, as follows:

"After careful review and consideration, it has been decided that the evidence of record is insufficient to warrant a permanent and total disability rating at any time subsequent to your discharge from service under the above date. Therefore, the benefits claimed must be denied by the United States Veterans Bureau.

"This letter is accordingly evidence of a disagreement under section 19 of the World War Veterans Act, 1924, as amended."

It is obvious that the claim made for total and permanent disability is predicated upon the injury claimed of September 4, 1917, at Fort Schafter, Honolulu, and it is immaterial as to the claim whether there is liability under a formal policy issued upon application or upon the statutory liability for automatic insurance. The claim was definite, specific, exact, and denied. There was only one liability, and this *very* claim the applicant later prosecuted by his suit. The purpose of the provision is that the United States may be advised of the particular claim, to the end that it may be investigated, and the United States may not be sued until the claim is denied. Denial of the claim is jurisdictional. The particular claim upon which judgment was entered is the *very claim denied by the Veterans Bureau,* and is in complete harmony with the expressions of this court, through Judge Wilbur in Berntsen v. United States, 41 F.(2d) 663, 665: "The disagreement contemplated by the statute must be a rejection by the government through the Bureau of the very claim which the applicant later presents by his suit."

There was no error in holding this claim and denial sufficient.

The plaintiff testified that he worked as motorman from October 7, 1918, to February 19, 1919; at the Oregon State Hospital, March 25, 1919, to May 15, 1919; Union Stock Yards about three weeks; Park Bureau, City of Portland, June, July, and August, 1919; operated elevator Fenton Building, from two weeks to a month; vocational training from March, 1920, for two months, meter repair work; Warren Construction Company a short time in the summer of 1920; vocational training Alexander Badley Company, November 10, 1920, to latter part of June, 1921, as tractor mechanic; Fordson Tractor Caravan, Canadian Border, summer, 1921; Universal Garage, Union avenue and East Yamhill street, Portland, Or., vocational training; to the Canadian border and back, drove the tractor until it reached Port Angeles. "I could not stand it and had to rest; I went to bed until they were ready to go to the next place; I went with them, but was not able to drive the tractor." Work O. K.'d by the Veterans' Bureau Universal Garage. "I stayed until the place changed hands, and then I stayed around waiting for them to use me, until I got tired. That was in December, 1921. I then found a place in the Hawthorne Garage, Eighth and Hawthorne; stayed three or four weeks, and left because I was suffering so I could not do any work; then went to the Veterans Hospital; was there three weeks, receiving treatment for my leg. That was in 1922. Then stayed at home during the summer until the 20th of September. July and August was put in a shoe repair shop for training; was not able to do anything further until about the 20th of September, 1922; I then went to work at the Swift & Company Packing Plant." Worked in the slaughter room, hosing out; played out in three hours and went home. "After I rested up, I went to work in the wool department at Swift & Company, where it was warm and dry." Graded and weighed and baled the wool. "My leg bothered me, I complained to the foreman, it did not do any good." *Worked there from the 20th of September until about February 24, 1923;* went into training upholstering furniture; stayed there about six weeks when the shop burned down; then went to the Kingfisher Mattress Company; then "out to the old place, Columbia Paper Box Company," where he stayed three or four months. "My leg was bothering me. I got another place with the Kingfisher Mattress Company, in 1923, where I stayed about four months." Could not stand the work and quit. "Stayed in bed part of the time doctoring myself about six weeks; in December, two or three weeks or a month after I stopped training I was taken to the Veterans Bureau; they held a consultation there and finally decided to send me to Seattle." Went to the hospital at Seattle for the night, and

next morning "took me home to Portland"; was home about five months. "They took me out of training so I started picking up odd jobs until about April, 1925. I then went to work for the American Can Company, April 4, 1925, as night watchman. I stayed there 26 months; my duties were punching the clock." "Sometimes I didn't have to do anything except punch the clock. The first year I worked from twelve midnight until seven in the morning; after that from twelve midnight until eight o'clock in the morning. At times I had some janitor work to do, swept the floor. One other night-watchman besides myself was employed there. Each had his own particular duties, a separate portion of the building to cover. * * * I had to climb up and down stairs, a part of the time used the elevator. I wasn't supposed to; I could use it if I preferred to, and no one would know the difference. I had nine or ten stations to punch every hour. I was given twenty minutes to make the rounds. It would not take twenty minutes to do it because the stations were close together. They were located in the basement, on the main floor and upstairs, three floors. There was only one station in the basement." "While there my knee bothered me and I was lame * * * (no other complaint was made). Did not do anything until I went to work for the Pacific Car and Foundry Company in the spring of 1928." Stayed there two months and "left because I was suffering so I could not work." Went to the government hospital and stayed there two months and twenty-two days. "I have not been able to do anything since; my leg bothered me since then and it bothers me now. *I cannot work without limping;* I carry a cane because I can get around better and in case I got to fall, I can catch myself better."

While in vocational training he received $150 a month, from the date of his marriage, December 18, 1921. "Except about four months I was at Forest Grove, I received $80.00 a month. I first went into training on the 27th of February, 1920, with the Portland Railway Light & Power Company; I went to school at Third and Madison Streets, Portland, a government school, while I was waiting to be placed in training; then I was out of training almost five months, during which time I went to Eastern Oregon; stayed about six weeks, came back; stayed a while, then went back to Eastern Oregon again; while over there visited a friend at Pendleton and my niece at Freewater six weeks. I did not work at Pendle-

ton, but worked a few days at Freewater. When I came out of the army I had to go to work after about three months. When at Pendleton, I had about $600.00; while at Freewater, I received a check from the Government for $1307.33 compensation."

The doctor testified that he met appellee professionally about June, 1929, and examined him at that time and found him suffering with acute pains, swelling and inability to use or stand on the right knee in any way; pain on both sides of the knee and down the back of the knee; plaintiff was in bed about three weeks under his care, and then in the hospital later on; found some disturbance in the right knee joint itself; from history of repeated trouble "I presume it was probably some old trouble that had an acute flare-up." "While in the hospital, from history, I gathered they made an attempt to straighten his knee, but it was in a locked position; they were unable to break it down; he was put in a cast. This is one of the conditions we find in misplaced cartilages." And further stated, assuming that appellee, September 4, 1917, at Fort Schafter, T. H., went into a trench and fell against some sharp instrument whereby he sustained an injury to his right knee and the misplacement of cartilage took place at the time through that injury so that it locked the knee joint, "in the absence of healing or curing I would say that the man thereafter was totally and permanently disabled." The doctor's attention was called to a letter which he had written April 19, 1929, in which he stated that he found extreme pain on either side, with involvement of the nerve of the knee, and didn't mention anything besides sciatica.

Lay witnesses were called who testified they knew appellee a little over five years at the time of trial; lived at the same apartments; he worked at night; saw him in the daytime; he would get up complaining; sometimes heard him groan in his sleep; in walking he was lame; used a cane. "It seems to me he was using a cane ever since I have known him." "It seems he is using a cane off and on all the time; I am a friend of the family."

Another witness had known appellee for ten years, friendly, but not related; he was lame; "noticed that he was also lame and in pain in his leg."

Another witness testified he had known appellee for ten years; "he is lame and has been ever since I have known him."

Another witness said: "I knew him six months before he was married to my sister.

He has always favored that leg." Appellee seemed restless and turns over many times in bed; "I could hear him from an adjoining room. He used to moan quite a bit."

Another witness, a brother-in-law, had known appellee ten and one-half years; "he has always been lame. in his right leg, and he has used a crutch or cane and favored that right side ever since I have known him."

The wife testified his right leg has been continuously lame; "lots of times while he is sleeping he gets cramps in that leg. I rub it; that relieves it. When he works nights, in the daytime he will start to groan. First I didn't know what was the matter. I knew he had trouble with his knee."

The original complaint was filed August 8, 1930.

The doctor first met appellee eleven years and nine months after the injury, "assuming" it an old chronic trouble that had "an acute flare-up." He treated him about three weeks, and appellee was then transferred to the Veterans' Hospital. He wrote two letters to the hospital service during the time of the treatment. In one he said that appellee was suffering with sciatica, but gave no other ailment; and in the other he suggested that "tonsils, teeth, sinuses be examined to ascertain the presence of foci of infection."

At the trial, practically fourteen and one-half years after the injury, in response to the following question: "Assuming that Charles A. Kerr on or about September 4, 1917, at Fort Schafter, Territory of Hawaii, went into a trench and fell against some sharp instrument whereby he sustained an injury to his right knee and a misplacement of the cartilage took place at that time, so that it locked the kneejoint, in the absence of healing or curing, would you say that he was totally and permanently disabled at that time?" The doctor answered, "Yes." This question does not detail a continued condition, nor is it predicated upon the evidence in the case, assumes a condition which is not shown, and the answer thereto is not substantial evidence. The court may undoubtedly judicially know that a man with a locked knee joint is not totally disabled and because the knee is stiff or the cartilage is misplaced, does not establish total and permanent disability. While no objection to the question appears in the record, it is so palpably improper that the court may not pass it over, as it does not tend to elucidate the vital fact in issue.

The plaintiff's testimony shows that he worked periodically and had to his credit many months of work; and that he did work continuously for twenty-six months for the American Can Company from 1925 to 1927, and other periods covering more than fourteen years from the date of discharge to the date of trial, and these periods of employment were not included in the question. That the conclusion of the doctor would have been otherwise, if the employment periods had been included in the question, the court should recognize, since the answer is contrary to the admitted physical facts.

To prove total permanent disability, plaintiff must show by a fair preponderance of the evidence, impairment of capacity to carry on continuously a substantial, gainful occupation, which total impairment is reasonably certain to continue during life. Totality and permanency are essential elements and must be established by substantial evidence and cannot be found by speculation, surmise or conjecture. The evidence must show something of relevant consequence, and not be vague, uncertain, incompetent, or irrelevant, not carrying the quality of proof, or having fitness to produce conviction, and be such that reasonable persons may fairly differ as to whether or not it proves the fact in issue. See United States v. Hill (C. C. A.) 61 F.(2d) 651 (instantly decided). Some substantial evidence must be presented to carry the case to the jury. The subsequent employment for the periods covered, in the absence of evidence of *inability* to work—not merely unemployment—and the nature of the injury complained of, refutes the idea that appellee was totally and permanently disabled at the date of discharge. United States v. Barker (C. C. A.) 36 F.(2d) 556; United States v. Rice (C. C. A.) 47 F.(2d) 749; United States v. Harrison (C. C. A.) 49 F.(2d) 227; United States v. LeDuc (C. C. A.) 48 F.(2d) 789; Ross v. United States (C. C. A.) 49 F.(2d) 541. And emphasis is further given to this fact by the doctor as to his ailments *at the time of the examination more than eleven years after the discharge when the disclosed condition was present,* attributing the ailment to *sciatica.* The physical facts positively contradicting the statement of a witness, control, and the court may not disregard them. American Car & Foundry Co. v. Kindermann (C. C. A.) 216 F. 499, 502; Missouri, K. & T. Ry. Co. v. Collier (C. C. A.) 157 F. 347, certiorari denied, 209 U. S. 545, 28 S. Ct. 571, 52 L. Ed. 920. Judgments should not stand upon evidence that cannot be true. Woolworth Co. v. Davis (C. C. A.) 41 F.(2d) 342, 347.

There is no evidence showing any infec-

804

tion of this knee at any time since injury, nor testimony of any condition believed to be neurosis. Nor is there evidence that the injury to the knee cap caused injury to the sciatic nerve and caused the condition which the doctor testified he described in the letters to the hospital. This case clearly appears to be within United States v. Fly (C. C. A.) 58 F.(2d) 217, in that the plaintiff admitted that he worked continuously for twenty-six months, "punched the clock" every hour in "nine or ten stations," was "given twenty minutes to make the rounds," but the "stations were close together," one in the basement, the others on the main floor and upstairs, "I had to climb up and down stairs."

The insurance is not against a lame knee, or a knee that "bothers," or against limping, or the use of a cane, but is against *total* and *permanent* disability from following continuously a substantially gainful occupation at the time of discharge and reasonably certain to continue during his lifetime.

Reversed and remanded.