## UNITED STATES v. LA FAVOR et al.
### No. 8609.

Circuit Court of Appeals, Ninth Circuit.
April 25, 1938.

J. Charles Dennis, U. S. Atty., and F. A. Pellegrini, both of Seattle, Wash., and Oliver Malm, Asst. U. S. Atty., of Tacoma, Wash., and George R. Stuntz, Atty., Department of Justice, of Seattle, Wash., and Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett and N. A. Townsend, Sp. Assts. to the Atty. Gen., and Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C., for the United States.

A. W. Newman and John T. McCutcheon, both of Tacoma, Wash., for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought by a veteran to recover $7,000 upon his war risk insurance

policy which lapsed April 30, 1919, for nonpayment of premium. The jury found that the veteran became totally and permanently disabled on March 21, 1919, prior to the lapsing of the policy. Judgment for plaintiffs followed. The insured reinstated $3,000 of the lapsed term insurance which was in force until his death. He died January 11, 1932, after the commencement of this action. His widow was substituted as administratrix, and his mother, the beneficiary under the lapsed term insurance policy, was joined as plaintiff. The government appeals.

The government assigns error in the denial of its motion for instructed verdict in its favor.

It is clear from the evidence that for long periods of time the veteran's physical condition and his earning capacity had been seriously impaired. The question is whether that impairment had reached such a stage that total and permanent disability at the time of his discharge or before April 30, 1919, was reasonably certain.

At the time of his discharge and on five subsequent dates when he made application for the reinstatement of his lapsed converted insurance, the veteran certified to his physical condition. The certificate upon his discharge was to the effect that he was in good health. The other certificates were to the effect that at the dates specified he was not suffering total and permanent disability. These statements were made on the following dates: January 25, 1921, October 5, 1922, October 25, 1924, June 27, 1925, and April 6, 1926.

The evidence was largely directed to a proof of his condition after the time of his discharge. There is very little evidence as to his condition in April, 1919. He had been ill before that time and spent six months of his eighteen months of service in the hospital; the first 98 days were at Camp Lewis. After this period he was restored to duty as cured and was a part of the Expeditionary Force to France. In France he suffered injuries as result of his service. He was gassed, suffered from shock, and probably from traumatic injury to the back. There was no expert evidence adduced as to his condition at the time of discharge, except the certificate of the physician who examined him then and who certified that he was not disabled.

There is no question under the evidence but that the veteran suffered from serious disability during a large part of the time after his discharge and until his death. The difficulty is in relating this condition back to the time of discharge, at which time he certified to his own good health, and the physician examining him gave him a clean bill of health.

The question of whether or not the conditions found at the later examinations in 1931 related back to and indicated his condition prior to the lapsing of his war risk insurance is primarily a medical question. Upon this subject the appellees introduced the testimony of two experts.

Dr. John F. Steel testified that he made his first examination of the veteran October 10, 1931, after this suit was brought; the veteran having been referred to him by his attorney. The witness also participated in the autopsy in 1932.

He testified that the veteran told him in 1931 that: " * * * He had been having pain in his chest, at times very severe, over the left chest and extending into the arm on the left arm, to the elbow and sometimes down through the wrist, extending into the fingers. He has had attacks of pain ever since he was in the army. * * * At times he has typical attacks of angina pectoris, which come on after eating. * * * " He also testified: "In making my diagnosis of angina pectoris, I made it on the history of subjective symptoms, when I first made my diagnosis. I made it on the history alone. That history started in his war service, pain in his chest." He testified that there were no objective symptoms of the veteran upon which a diagnosis of angina pectoris could be made. He was asked the following question: "Q. Taking the patient's history and your examinations of him into consideration, of what duration would you say his heart condition was?" To which he replied: "A. I would say that he had this ever since he was in the army. I would say it was of long duration."

He then testified that most work in a lumber mill would be too heavy for a patient with coronary disease, angina pectoris, and that where a person having angina pectoris worked at such heavy work, "It would be apt to increase his number of attacks, and of course, the final cause is death."

██ Taking the testimony of this witness as a whole, so far as it relates to the condition of the patient in 1919, it amounts to no more than a statement that the veteran

told him in 1931 that he had pains in 1919 characteristic of angina pectoris. Such statements of past pain, even if made to assist a physician to treat the patient, are generally excluded, Wigmore on Evidence, § 1772, and if admitted have little more probative value than other hearsay evidence.

Dr. W. H. Goering, an orthopedic surgeon, testified for the plaintiffs that he examined the veteran October 14, 1931, at Tacoma, and found traumatic arthritis of the spine. He further stated: "From the history and from my findings at the time I saw him, I would say that his condition as I found him at the time I made the examination was something that lasted over a period of years, not just of recent origin." He testified that when he saw the patient, "I would say, generally, he couldn't follow any hard occupation that involved heavy work, laborious work, from my findings at the time." He testified:

"From the examination that I gave Mr. LaFavor in October, 1931, I would say that that arthritis had been in process a period of years.

"Q. You couldn't though, without speculating, say just when? A. I could say, definitely, it wasn't recent. I could not tell when, exactly; nobody could. Arthritis is what is called a progressive disease."

The testimony of Dr. Goering is not sufficient to relate the patient's arthritis back to the year 1919, for he expressly disavows any ability to make such a retrospective diagnosis. In view of the fact that the veteran was frequently in government hospitals and under the care of physicians who failed to discover angina pectoris during the ten or twelve years at times when he was under such treatment and observation, the testimony of Dr. Steel, in so far as it relates the heart condition back to 1919, is not substantial evidence even if it could be characterized as a scintilla of evidence of such condition in 1919.

The medical testimony of the plaintiffs' witnesses is insufficient to justify a verdict of total and permanent disability in 1919. It remains to consider the effect of other evidence on that subject.

The government medical records of the veteran show that after his entry into the service he was admitted to the base hospital at Camp Lewis in January, 1918, and treated for various illnesses, including pleurisy, scarlet fever, influenza, diphtheria, and arthritis. While serving in France he was injured by a shell explosion and gassed, and was treated in base hospitals for neurasthenia, pleurisy, arthritis in the left hip joint, and other complaints. However, when examined upon his discharge, he was certified as not disabled, and he signed a statement to that effect.

Reports made in connection with the veteran's claims for compensation and vocational training show that from 1919 to 1924 the veteran's most serious condition was a possible sacroiliac strain. Other conditions were thickened pleura due to previous pleurisy, traumatic neurosis, and chronic conjunctivitis. Vocational training was recommended. Reports made from 1925 to 1931 show additional diagnosis of neurasthenia, with hysterical manifestations, hyperopic astigmatism, chronic catarrhal otites media, arthritis, chronic, sacroiliac bilateral; small parenchymatous goitre; pyorrhea; prostatitis; sciatic neuritis; and arthritis of the dorsal spine and sacroiliac.

Dr. Albert C. Feaman examined the veteran December 15, 1925, and October 19, 1931. The examination of 1925 was for pulmonary tuberculosis. None was found. The 1931 examination was of heart and lungs. "No cardiac pathology," was the finding. There was no history of cardiac pain.

From the work record of the veteran it appears that during certain periods subsequent to his discharge the veteran worked for compensation. He worked in an electric light plant for a few months in 1919 (April to July) at a compensation of $90 a month, and was employed in a flour mill for a number of months during the years 1919 and 1920. Martha La Favor, the veteran's wife, testified that he was employed in a flour mill from the last of March, 1920, until the latter part of September, but that during that period he worked only an average of about four hours a day, going to work at 9 in the morning and working until 11 o'clock and then returning to work at 2 in the afternoon and working until 4. She testified that she was married to the veteran on March 28, 1920; that she knew him before he entered the service, and that when he returned home she noticed a marked change in his appearance. She testified that he had blisters on his lips; that the whites of his eyes were red and blurred; and that he had wounds on his body. She also testified that while the veteran was employed at the flour mill there were many days when he was too ill to go to work;

that he was compelled to eat light food and frequently vomited after breakfast; that he spent two weeks in a hospital in February, 1922, and was attended by various doctors at different times and visited by government nurse on numerous occasions.

It is indicated by the testimony of George W. Johnson and Paul Crum, however, that the work done by the veteran in the mill and electric light plant was heavy work, and that the weight of sacks he handled in the mill was about 100 pounds. It also appears that from October 27, 1920, to June 7, 1924, the veteran received vocational training as follows: He was a student at North Western Business College, Spokane, from October, 1920, until May, 1922. He spent about 3½ months (from February 1 to May 15, 1922) as a poultry man on the farm of L. C. McPherson. From June 26, 1922, to March 21, 1923, he attended the University of Idaho where he registered for courses in poultry husbandry and horticulture, and then moved to his own farm at Colville, Wash., where he continued to live until 1928.

L. C. McPherson, who conducted the farm at Sagle, Idaho, where the veteran was placed by the Veteran's Bureau to learn the poultry business, testified that during the three months the veteran worked for him he was engaged about 12 hours a day helping in the care and feeding of poultry. He testified that the veteran complained at that time about his lungs and told of being gassed, but that the veteran's lung trouble did not interfere with his work. He further testified that the veteran's work was satisfactory while in his employ, and that he took no time off because of illness. The witness testified that he did not observe a limp or lameness in either of the veteran's legs, and that had the veteran been noticeably lame he would have had an opportunity to have observed it. Mrs. L. C. McPherson testified in substance as her husband did. She testified that she noticed no physical disability in the veteran, although he complained of his lungs and tired easily.

The testimony indicates that the veteran's health became steadily worse.

George Bogart testified that the veteran's wife did the chores; that his leg and right arm were not any good, his complexion was pale; that he could not straighten up, and was unable to lift a harness.

Glen L. Somerlott testified that he never saw the veteran do manual labor; that the veteran's posture was stooped forward and slightly to the right; that he saw the veteran attempt to load a wagon, and that he was unable to do it.

Peter Wormeringer testified that the veteran's wife did most of the work on their Colville farm, and that the veteran was stooped over and had a sore arm and favored his back. He testified that the veteran worked for the witness at one time, but that he had to let the veteran go because he was unable to do the work; that he paid the veteran $2 a day while he paid other workmen $3 to $4 per day.

Dr. D. A. Seibert, employed by the United States government and stationed at the hospital in Walla Walla, Wash., testified that he examined the veteran about December, 1925, in Seattle, Wash., for arthritis; that the clinical findings were negative but that the X-ray showed arthritis in the left sacroiliac joint. He testified that he also examined the veteran in August, 1927, and found the same condition present in the sacroiliac joint, and also a little arthritis in the lumbar spine.

Dr. George E. Pfeiffer, physician employed by the United States Veteran's Administration, Portland, Or., testified that he examined the veteran in 1925, 1926, 1927, and 1928; that the first examination disclosed an early moderate rheumatic condition, and that the last examination in 1928 disclosed a very marked far advanced arthritic condition, clinically. His opinion as to the duration of the arthritic condition was one or two years prior to 1925. Dr. Pfeiffer examined X-rays of the spine of the veteran taken October, 1931, and found arthritis in the upper cervical spine at a very early stage and arthritis in the sacroiliac joint fairly well developed; a rather marked arthritis.

The testimony of the lay witnesses for the appellees, set out, indicates that arthritis finally disabled the veteran, and this conclusion is substantiated by the medical testimony which indicates that there was a marked advance in the disease from 1925 on. Arthritis, if present in 1919, was certainly not developed to such an extent as to render the veteran permanently and totally disabled in 1919. This is clear from the veteran's work record. Even if, at the time the policy lapsed, the veteran's health was such that it was not possible that he continue his former work as a laborer or do heavy work, that did not of itself render him totally and permanently disabled, unless it was impossible for him to follow continuously

any substantially gainful occupation. U. S. v. Derrick, 10 Cir., 70 F.2d 162; Lumbra v. U. S., 290 U.S. 551, 54 S.Ct. 272, 78 L. Ed. 492; U. S. v. Derrick, 4 Cir., 83 F.2d 99; U. S. v. Hill, 9 Cir., 61 F.2d 651.

It should be noted here that no claim was made to recover because of total and permanent disability until almost nine years after it is now claimed to have existed. This is strong evidence that the veteran was not totally and permanently disabled before his policy lapsed. Lumbra v. U. S., 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

The pursuit of vocational training is inconsistent also with the claim of permanent disability. Blair v. U. S., 8 Cir., 47 F.2d 109; O'Quinn v. U. S., 5 Cir., 70 F.2d 599.

The cases we cite below sustain our conclusion that the evidence of total and permanent disability in 1919 is not sufficiently substantial to support the verdict. U. S. v. Hansen, 9 Cir., 70 F.2d 230; U. S. v. Hill, 8 Cir., 62 F.2d 1022; U. S. v. Kerr, 9 Cir., 61 F.2d 800; U. S. v. Howard, 5 Cir., 73 F.2d 980.

In view of this conclusion, it is unnecessary to consider other questions raised.

Reversed.