## CUDAHY PACKING CO. v. NATIONAL LABOR RELATIONS BOARD (PACKING HOUSE WORKERS' UNION OF ST. PAUL, Intervener).*

### No. 411.

Circuit Court of Appeals, Eighth Circuit.
March 27, 1939.

*Rehearing denied April 25, 1939.

Edward S. Stringer, of St. Paul, Minn. (Thomas Creigh, of Chicago, Ill., on the brief), for petitioner.

Charles Fahy, Gen. Counsel, National Labor Relations Board (Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, and Robert S. Erdahl and Joseph A. Hoskins, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for respondent.

William C. Green, of St. Paul, Minn. (Emil A. Feyereisen and Edgerton, Green & Edgerton, all of St. Paul, Minn., on the brief), for intervener.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

This is a Labor Board controversy affecting the workmen of petitioner at its meat packing plant located in Newport, Minnesota. A complaint issued by the Labor Board charged the Packing Company with unfair labor practices (1) in the discharge, because of membership in and activities in behalf of Packing House Workers Local Industrial Union No. 62 (hereafter called Industrial), of Arthur Maurer, Oliver Simpson and Leonard Weiss; and (2) in dominating and interfering with the formation and administration of Packing House Workers Union of St. Paul (hereafter called independent Union) and in contributing support thereto. The Packing House Workers Union of St. Paul was permitted to intervene at the hearings before the examiner and the Board. The Board found unfair practices as to discharge of Maurer and as to domination of, interference with and support of the Packing House Workers Union of St. Paul. From a cease and desist order,[1] with certain required affirmative ac-

---

[1] The order was as follows:

"Upon the basis of the above findings of fact and conclusions of law and pursuant to Section 10 (c) of the National Labor Relations Act, [29 U.S.C.A. § 160 (c)] the National Labor Relations Board hereby orders that the respondent, The Cudahy Packing Company, and its officers, agents, successors, and assigns shall:

"1. Cease and desist from:

"(a) In any manner dominating and interfering with the administration of Packing House Workers' Union of St. Paul or any other labor organization of its employees, or contributing financial or other support to Packing House

Workers' Union of St. Paul or any other labor organization of its employees;

"(b) Giving effect to its contract with Packing House Workers' Union of St. Paul;

"(c) Discouraging membership in Packing House Workers Local Industrial Union No. 62 or any other labor organization of its employees by discriminating in regard to hire or tenure of employment or any term or condition of employment;

"(d) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collec-

tion, the Packing Company filed its petition for review. The Board responded asking, also, enforcement of the order. The independent Union was allowed to intervene and challenges the order in so far as it relates to it.

Petitioner presents here three points which are as follows: (1) No substantial evidence of domination or interference with formation of the independent union or of contribution to the support thereof; (2) even if there be found evidence of domination or support "at the inception of" the independent union, the evidence conclusively showed no domination at the time of hearing; (3) no substantial evidence of discharge of Maurer because of union activities in connection with the Industrial. Intervener supports points 1 and 2. We think the order should be approved with a definition as to the term "disestablish" (used in the order) and with a direction as to the inclusion of certain matter in the notice of compliance (required in the order).

First. Domination of Independent Union. For about sixteen years prior to April, 1937, there existed at this plant a "Plant Conference Board" which handled grievances of the plant workmen. This board was composed of equal employe and company membership. In April, 1937, two of the employe members were William B. Callahan and D. J. Peabody—the former representing the pork kill and cut, calf kill and cut and sheep kill and offal departments, and the latter representing the mechanical department. Each of them had been such member for many years and Peabody had, also, been chairman of the grievance committee of the employes for about ten years. Callahan was a butcher in the pork cutting department and Peabody was a saw filer in the mechanical department. On Friday, April 16, 1937, these two men met by chance in a hallway at the plant. Because both had been very active in settling grievances for the employes, and because "there was a great deal of talk of the Wagner Labor Act, 29 U.S. C.A. § 151 et seq.[2] breaking up the company union" and because there was much talk of organizing unions in the packing industry, they discussed what should be done. They thought an independent union might be best and decided to take the matter up with the plant manager, Mr. Foster. The following morning (Saturday, April 17th), they went to see Mr. Foster. They asked him if the Conference Board would be done away by the "Wagner Bill" and Mr. Foster stated "that in all probability it would be". Then they explained what they intended to do and asked his opinion about it. He said that "neither could he encourage or discourage us, that at any time that we had fifty-one per cent of the employes that he would have to recognize

---

tively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C. A. § 157].

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Packing House Workers' Union of St. Paul as representative of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and completely disestablish said organization as such representative;

"(b) Offer to Arthur Maurer immediate and full reinstatement to his former position, without prejudice to his seniority and other rights and privileges;

"(c) Make whole said Arthur Maurer for any loss of pay he has suffered by reason of his lay-off by payment to him of a sum of money equal to that which he would have earned as wages during the period from the date of his lay-off to the date of such offer of reinstatement, less the amount he has earned during such period;

"(d) Post immediately in conspicuous places throughout its plant in Newport, Minnesota, notices to its employees stating that the respondent will cease and desist in the manner aforesaid;

"(e) Maintain such notices for a period of at least thirty (30) consecutive days from the date of posting;

"(f) Notify the Regional Director for the Eighteenth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.

"3. And it is further ordered that the allegations of the complaint be, and they hereby are, dismissed with respect to Oliver Simpson and Leonard Weiss."

[2] The preceding Monday, April 12th, the Supreme Court had handed down opinions in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and other labor cases.

us." Callahan and Peabody withdrew into another office where they decided an attorney would be necessary to help in organizing under the Act and determined upon William C. Green because they knew of his successful handling of several matters at the plant. They contacted Green and arranged to see him that afternoon. They then returned to Foster and asked if they could see him later in the day and suggested they would rather meet outside the plant. Foster "suggested that he get a room for us some place in town [St. Paul] and it was finally decided that he get a room at the Hotel Lowry" and that Foster would meet them about 2:30 P. M. that afternoon in the hotel lobby.

Callahan and Peabody got in contact with several men, and these two with three others went to the hotel. The five men were all employe members of the Conference Board (except one who was a "deputy" or alternate of Callahan on the Board). They met Foster in the hotel lobby and he took them to the room he had engaged. They explained to Foster "the possibilities of organizing an independent union." He read them the Wagner Act and explained there was nothing he could do to restrain them from organizing and that he would have to recognize them any time they had fifty-one percentum of the men. The men phoned Green and he came over to the room. They, and afterwards Foster, told Green "the boys had started organizing" and he was wanted as their attorney. Mr. Foster left shortly. The men talked over with Green what was necessary to be done to organize and arranged for Green to draw up membership application blanks and have them at the hotel next morning.

The committee (of five) met around 9 o'clock next morning (Sunday) and Green brought the application blanks. The five then started telephoning employes to come to the hotel and bring any others they could get. It was explained that they were forming an independent union and men were asked to sign membership applications. Two "straw bosses" were asked to join, did so and were active in getting others in.[3] Callahan telephoned Foster to come down as some men were hesitant about signing up for fear of discrimination. Foster came and told the men there

was nothing he could do to encourage or discourage them and that, if fifty-one percentum joined, he would have to recognize them. Mr. Challberg, assistant superintendent, was there. Mr. Rosenberg, head efficiency man, was there or around there in the corridors. The Sunday meeting and campaign at the hotel continued until about half past four in the afternoon. The next day (April 19th) the plant was closed for business reasons. During that day, the committee met at the hotel in the morning and continued the campaign for members during that day. Mr. Foster, Mr. Challberg and Mr. Rosenberg were there as on the day previous.

Mr. Green, the attorney employed by the committee, was present and active during these two days. Foster had rented the room, for the meeting on Saturday, requested by the men. On Sunday and Monday, Green rented the rooms. Green paid for rooms, liquor, cigarettes, cigars, typewriter rental, telephones, etc. The contract of employment provided for a fee of $150 to Green with no mention of expenses. After voluntarily paying the above expenses, Green had little left from the fee (which was later paid by the independent union). Formerly, Green had represented the company in a few cases—the last seems to have been in connection with the (so-called) N. R. A. In Martindale legal directory, the company was listed as a client of his firm. Also, he had represented individual employes of the company several times.

The solicitation of membership continued. By Wednesday (April 21st) a decided majority of the employes had signed applications for membership. These applications set forth that a labor organization of the employes at the plant was "being formed" to be known as "Packing House Workers Union" and that the applicant designated "such organization when formed (and until its formation, the employes' organization committee consisting of" named persons) as "agent for the purpose of collective bargaining". On Wednesday (April 21st), a letter from the committee was sent to the company wherein a membership of more than fifty-one per cent was claimed and recognition as exclusive bargaining agent demanded. Mr. Foster (manager of the plant) verified the

---

[3] At first, it seems to have been the idea that "straw bosses" would be eligible to membership. Shortly afterwards and before the first meeting of the members, it was determined otherwise and their applications were refused.

membership sufficiently to convince himself that the applications covered more than fifty-one per cent of the employes and wrote the company headquarters at Chicago, sending copy of the letter from the committee and asking for instructions. On April 26th, the company (by Foster) wrote the committee according recognition as exclusive bargaining representative to the committee (interim) and to the above organization when formed.

April 27th, those signing membership applications held their first meeting—in a hall rented by the organization committee. The only persons present who were not workmen were Mr. Green and a Mr. Curtis. It seems Mr. Green was there to give such aid as might be required in organization and in adoption of by-laws. Mr. Curtis (a lawyer) had been requested to attend by one of the men for the purpose, mainly, of examining the by-laws. The meeting was largely attended (over 400 out of 650 workmen at the plant); one of the committee (at request of the committee) acted as chairman; there was extended discussion, resulting in adoption of by-laws and complete organization, except for signing of Articles of Association by some of the men. Both before and after this meeting, members signed these Articles in the cafeteria at the plant, during working hours and without pay deduction.

Of the officers elected, only two (George R. French and Ralph Oehlke) were from the organizing committee. Those two were members of the board of directors, French being vice-chairman of the board. Arthur Maurer (the employment of whom is in-

volved in this review) was elected president. Francis L. Lindusky (a butcher at the plant) was elected vice-president and succeeded to the presidency when Maurer resigned. Eugene L. Ross (a checker on the loading dock) was elected secretary-treasurer. None of these three men had had any part in organizing the independent union and Lindusky was not at the hotel at all.

Later there was a meeting at Omaha of employe delegates from various plants of the company. Two delegates were selected and sent by the board of directors (or trustees) of the independent union and the expenses paid by the union. The evidence is very meager concerning this meeting but it seems to have been to reach contracts with the company. At any rate, a contract was made between the board of directors of the union and the general officers (at Chicago) of the company. This contract was approved at a membership meeting of the union. It is dated June 4, 1937, and was to be effective for one year from June 14, 1937. The contract covered seniority, hours of work and terms of employment, vacations, activities, strikes and lock-outs, and changes in the contract.

During May, June and July, 1937,[4] the independent union handled 640 grievances,[5] of which only 25 (or 3.9%) were in all respects rejected. The settlement results of these grievances entailed an additional expense of about $75,000 on the company.

The independent union has membership dues, is self-supporting and the only evidence of any expenditures paid by any

---

[4] The hearing before this examiner began August 6, 1937.

[5] Types of grievances were as follows: "The number of each type and classification of grievances were as follows:

Vacations (two weeks) ............ 23
Vacations (one week) ............ 54
Mechanical Piecework ............ 45
Mechanical Change to hourly salary 17
Sausage Piecework (See Note).... 22
Grievance on Wages allowed....... 339
Seniority ........................ 13
Straight rates .................... 73
Wages rejected ................... 25
Checking rates by Timestudy Department ......................... 13
Working Conditions .............. 36
Pay for Illness ................... 1
Transfer on account of Relationship 1

Total · 640

Note: Sausage Piecework's 22 were

previously included in the Wages allowed and does not become a part of the total.

The 25 grievances rejected represent 3.9% of the total number handled.

The grievances on working conditions consisted mainly of requests for oiled jackets, relief on various jobs, and more healthful working conditions.

The grievances which were referred to the Timestudy Department for Checking resulted in new Piece Work Schedules in the Ham House, Sliced Bacon, Sausage, Departments and the installation of piece work for the first time in the Cooperage and Mechanical Departments.

The restoration of seniority rights also included rights to a vacation, which in most cases was for two weeks.

In most cases where straight rates were allowed the employee received his top rate for all work performed."

official of the company is 75 cents for rental of a typewriter on Saturday, April 17th, at the hotel.

The only evidence bearing on any domination of or influence upon the independent union since its organization is the following: (1) Ralph Foldenauer (organizer for the C. I. O. and not an employe of this or any other company) testified to two statements made by E. L. Ross. The time of the statements is not definitely fixed but must have been after Ross had been elected secretary-treasurer of the independent union—as such official, Ross was the only salaried official of the union and seems to have devoted his time thereto. The evidence is as follows:

"Q. Did Mr. Ross ever say anything to you about Mr. Foster giving him orders? A. Yes, he did.

"Q. When? A. Well, I wouldn't say the exact date. I know it was soon after the independent union opened their office where they now have their office.

"Q. Was the conversation held in the independent union's office? A. Yes, it was.

"Q. What did he say? A. Well, I was just talking union with Mr. Ross and we were standing facing out toward the road, and Mr. Foster come up from up toward the plant, and Mr. Ross said to me, 'Don't let Mr. Foster see you in here talking to me, because I got hell for talking to you guys once before.'

"Q. Is that all he said? A. Yes, it is.

"Q. Did he later say anything about Mr. Foster? A. Yes, when Mr. Ross attended an independent union meeting of the Armour & Company employees.

"Q. Were you present? A. I was present.

"Q. What conversation did he have with you regarding Mr. Foster? A. He was on the stage trying to make a speech, and I brought this up to him, and he admitted it on the stage.

"Q. What did you say? A. I asked him if his union was not a company controlled union why Mr. Foster should give him an order.

"Q. And what did he say? A. He says, 'After all, you fellows have a dictator; John L. Lewis dictates to you.'

"Q. Is that all he said? A. Absolutely.

"Q. And did he say it to the four hundred people present in the hall? A. Yes, sir.

"Mr. Smoot: That is all."

Cross-Examination.

"By Mr. Green: Q. You and Mr. Ross have had quite a few arguments, haven't you? A. Not until after all that happened.

"Q. Well, you had several since? A. Not several; just once.

"Q. There isn't a very good feeling between you, is there? A. No, there isn't."

The statement of Ross at the Armour employes' meeting is also covered by witness John Funari, who said:

"Q. What did you hear him say? A. Practically the same thing as Mr. Foldenauer said. I heard Mr. Foldenauer ask Mr. Ross directly from the floor, when Mr. Ross was standing on the stage, if Mr. Foster had not gone by that day when Mr. Foldenauer and Mr. Ross were in the independent union's office and that Mr. Ross had then said, 'Yes, that did occur, but,' he says, 'I take dictation like you fellows do.'

"Trial Examiner Batten: What was that?

"The Witness: 'I take dictation like you fellows do.'

"By Mr. Smoot: Q. Speaking of Mr. Foster? A. Yes.

"Q. Was that all he said? A. That is about all he said."

(2) After organization, the company permitted, without loss of pay, certain men to leave work for a couple of hours for a meeting at the union hall. Also, several men were permitted to respond to the call of Callahan who talked with them about joining or adhering to the union—this during working hours with no pay loss and on plant property.

(3) There seems to have been some posting of notices, in the plant, for independent union meetings but there is no evidence that the management consented to or even knew of this being done until afterwards. There is evidence of denial of such privilege to the Industrial but no evidence of posting by the independent after this denial to the Industrial.

At the time the independent union was organized there seems to have been no counter activity of any other union. How-

ever, soon afterwards[6] the Industrial became active in trying to organize the plant. About the first or middle of June, Foldenauer conferred with Foster concerning reports that the independent union men were going around the plant during working hours getting members and selling buttons "and they were in the form of organizing yet." Foldenauer asked if his people would be given the same privileges. Foster "didn't seem to think we could." He said he could not interfere with the formation of any labor organization. Foldenauer said that was "all well and good, if he didn't interfere with theirs, he shouldn't interfere with ours." Foster said if Foldenauer would report any future activity of this kind to him he would "check up on it."

On July 7th or 8, 1937, Foldenauer, with a committee, discussed with Foster grievances concerning the laying off of members of the Industrial. Two of these members were Maurer and Weiss. Weiss was put to work. Maurer was not.

On July 15, 1937, Foldenauer and a committee conferred with Foster and demanded recognition as the bargaining representative of the plant workmen. Foster: "wanted to know if we had the majority. We said we did and we asked him or he wanted to know what proof we had of the majority, and we told him we had signed cards. We asked him if that would be proof enough, and he said no, and then Mr. Cole, I believe, asked him if he wanted a vote of the National Labor Relations Board, and he didn't want that either. So then we wanted to know what kind of proof he wanted, and we never did find out what kind of proof he wanted."

They asked if they would be allowed to post notices in the plant of their next meeting and that he had let the independent post notices. Foster said "he wouldn't let us post notices in the plant."

The above outline of the evidence is stated in the aspect most favorable to the Board—very much of the evidence thus favorable was sharply disputed. A summary of the result of this evidence is as follows. The independent union is, in form and capabilities, a labor organization. Organization of it was conceived and initiated by the workmen themselves. The influence of the management was present in the campaign for membership.[7] There was a form of cooperation by the management in perfecting the organization in that the committee was permitted to have the articles of association signed in the plant cafeteria during working hours and the men allowed to leave work and go to the cafeteria for that purpose—all without loss of pay. Since complete organization of the independent union, the only real evidence of any influence whatsoever of the management in the independent union are the statements (above described) attributed to Ross by Foldenauer (organizer for the C. I. O.) and Funari (a charter member of the Industrial).

While the evidence, by no means, shows any flagrant interference, much less coercion of employes in the formation or maintenance of the independent union, yet we cannot say there is not some, even though small, substantial evidence of company influence in the course of the organization and in the continued activities of this union. However, it does seem clear from the evidence that this company influence was relatively slight and that the situation here is quite different from the aggravated company action and coercion revealed in some cases, such as National Labor Relations Board v. Pacific Greyhound Lines,

6 Just when this activity began is not shown. The Committee for Industrial Organization issued a charter for a local union—Packinghouse Workers Local Industrial Union No. 62—to ten men on May 22, 1937. Foldenauer, organizer for the C. I. O. and in charge of the organization of this plant, testified "we started long before that" (May 22, 1937).

7 The presence of Foster, Challberg and Rosenberg at the hotel on the two days during which the membership campaign was taking place there is significant. There is a plausible and proper explanation for the presence of Foster. None is offered as to Challberg and Rosenberg and neither of them was offered as a witness—the company contenting itself with evidence, from various persons present at the hotel on those days, that they had not seen Challberg or Rosenberg.

Later at the plant, the campaign for membership continued during working hours. It is not shown that the manager (Foster) or the assistant manager (Challberg) knew of this activity within the plant but it is clear that it received the approval of the superintendent of the slaughter department (Ed Burns) under whom, apparently, most of the employes worked.

303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, and National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. There is enough evidence to sustain the order of the Board in so far as the "cease and desist" provisions are involved. Also as to the affirmative action "(a)", requiring withdrawal of recognition from Packing House Workers Union of St. Paul with the following definition as to the last expression therein reading "completely disestablish said organization as such representative."

In the earlier part of this portion of the order[8] is the requirement to "Withdraw all recognition from" the independent union as a bargaining representative of the employes. It is easy to understand this requirement to withdraw recognition as a bargaining representative. But what is meant by "completely disestablish * * * as such representative"? The order, elsewhere, requires the company to notify the regional director, within ten days, "what steps the respondent [company] has taken to comply herewith." Obviously, a wilful non-compliance with any part of the order (after this Court has directed enforcement)—including that to "completely disestablish"—will open the company or its responsible officers to penalties. Plainly, an order carrying such consequences should be so reasonably clear that the company will know what is required of it and the Court will know whether the requirements of the order have been met or have been avoided by the company. We confess we do not know what is meant by "disestablish" as used in this order. Other portions of the order (see footnote 1) require the company to cease and desist from "in any manner dominating and interfering with the administration of" or "contributing financial or other support to" the independent union and from "giving effect to its contract with" that union; also, the company is required to "withdraw all recognition" of that union as the bargaining representative of the employes. Just what else can the company do as to its relationship with the independent union?

What will it have to report to the regional director that it has done—beyond not dominating, interfering with, contributing to, giving no effect to the contract with and withdrawing all recognition of as the bargaining representative—to show compliance with the requirement to "completely disestablish said organization as such representative"? Although the term "disestablish" has been used in other orders both under the Railway Mediation Act, 45 U.S.C.A. § 151 et seq. (Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034), and under this Act (National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307) the nearest definition thereof is in the latter case where it seems (pages 267, 270, 271,) to be regarded as equivalent to withdrawal of recognition as a bargaining representative. If withdrawal of recognition as a bargaining representative or for any other purpose and cessation of all support (financial or otherwise) or encouragement are required, it would seem that everything possible to be done by the employer would be done. To clarify this term "disestablish" so that it may intelligently be obeyed by the company and enforced by this Court (if necessary), we define it as requiring the Company not to recognize, support or encourage the further existence of this particular independent union for any purpose or in any manner.

The situation here is very close to being within the suggestion of the Supreme Court that "We may assume that there are situations in which the Board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employees under section 9(c), 29 U.S.C.A. § 159(c), even though it had ordered the employer to cease unfair labor practices." National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 270, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307. The evidence here shows a very large degree of independence in the employes in initiating, or-

---

[8] This portion of the order is as follows:

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from Packing House Workers' Union of St. Paul as representative of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and completely disestablish said organization as such representative."

ganizing and administering this independent union. There is no showing of coercion and barely a substantial showing of any exercise of influence which might sway any of the employes in joining or not joining this union. The articles of association and the by-laws of the independent union convince that the organization has the form and structure adequately to function as a free representative of the employes.

While we would have had no difficulty in approving an order of the Board requiring an election to determine whether the employes at this plant preferred, as their bargaining representative, this independent union, or the Industrial, or neither, or some other, yet the right of each employe freely and fairly to choose his bargaining representative is so important and is so subject to subtile pressure that we do not feel like saying that the weight of an existing recognition of this independent union might not exert an unfair influence. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267 and footnote 2, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

On the other hand, the employes might well receive the impression that it was useless for them to attempt an independent organization—even though that might be their preference—if this union be stricken down. If entire freedom of choice by the employe is to be protected, there can be no harm and there may result good in clearly informing him thereof. We think this can and should be accomplished by inclusion in the notices ordered posted by the company the following:

"This order of the National Labor Relations Board does not restrict but is intended to protect the right of the employes freely to join or not join any labor organization or to form or not to form hereafter a local organization of their own."

▇ Second. Discharge of Arthur Maurer. On July 7, 1937, the company, for proper business reasons, reduced its force at this plant. Among those laid off was Arthur Maurer who had been working as a loin puller in the pork cut department. Seniority was the rule in this and other lay off of men—unless there were exceptional reasons to retain particular men. Seniority lists were kept posted in the plant. For some time until just before this lay off, the posted list for this department showed Maurer as twelfth from the top of twenty to thirty names. Revisions of such lists were made from time to time as needed to bring the lists up to date and such a revision was made just before and as a basis for this lay off. In the revised list, the name of Maurer appeared as fifth from the bottom. There is no dispute that if his proper place was twelfth from the top of the list he was improperly laid off and that if his proper place was fifth from the bottom his lay off was in accordance to seniority. There is substantial evidence that Maurer had been a controversial figure in the labor union situation at the plant and, unless his lay off was because of seniority, the Board was justified in concluding that it was because his union activities and affiliations was the reason for such lay off. Which of these positions on the list was rightfully his, depends upon whether his seniority rights were restored when he returned to work on May 13, 1936, after he had voluntarily quit the day previous.

There is entire agreement that any voluntary quitting would break the running of seniority. The dispute is whether, after this short period of absence, Maurer asked for and was restored to his seniority rights when he resumed work on the thirteenth of May. The testimony is substantial that there was such restoration. The order of the Board in respect to reemployment of Maurer is, therefore, upheld.

### Conclusion.

In the light of the hereinabove definition of "disestablish" and with the direction for inclusion, in the notices to be posted by the company under the order of the Board, of the matter set forth hereinbefore, the order of the Board is affirmed and an order of compliance therewith is ordered to be issued.