**HAMILTON–BROWN SHOE CO. v. NATIONAL LABOR RELATIONS BOARD (UNITED SHOE WORKERS OF AMERICA, LOCAL 125, Intervener).**

**BOOT AND SHOE WORKERS UNION et al. v. NATIONAL LABOR RELATIONS BOARD.**

**Nos. 425, 427, Original.**

Circuit Court of Appeals, Eighth Circuit. May 29, 1939.

Rehearing Denied July 24, 1939.

Lyon Anderson, of St. Louis, Mo. (J. S. Leahy and Leahy, Walther, Hecker & Ely, all of St. Louis, Mo., on the brief), for Hamilton-Brown Shoe Co.

Herbert S. Thatcher, of Washington, D. C. (Joseph A. Padway, of Washington, D. C., on the brief), for Boot and Shoe Workers Union, et al.

Ernest A. Gross, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Mortimer B. Wolf, Atty., Allen Heald, Atty., and Russell Packard, Atty., all of Washington, D. C., on the brief), for National Labor Relations Board.

Victor B. Harris and George E. Duemler, both of St. Louis, Mo., for United Shoe Workers of America, Local 125.

Before GARDNER and WOODROUGH, Circuit Judges, and BELL, District Judge.

GARDNER, Circuit Judge.

Two petitions for review of an order of the National Labor Relations Board are before us in this proceeding. The first was filed by an employer, the Hamilton-Brown Shoe Company, a corporation, and the second by Boot and Shoe Workers Union, an international union affiliated with the American Federation of Labor, and Local 176 of the Boot and Shoe Workers Union. The two petitions present distinct issues. The petition of the employer will be first considered.

On June 18, 1937, a complaint was filed against the Hamilton-Brown Shoe Company, petitioner herein, alleging that it had and was engaged in unfair labor practices affecting commerce within the meaning of Section 8(1), (2), (3), and (5) and Section 2(6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(1-3, 5), 152(6, 7). The complaint as amended, alleged: (1) that the petitioner's production and maintenance employees at its plant at Union, Missouri, known as the Hambro plant, constitute a unit for the purpose of collective bargaining; (2) that on May 17, 1937, a majority of said employees had designated Local No. 125 of the United Shoe Workers of America as their representative for the purpose of collective bar-

gaining; (3) that petitioner had refused to bargain with said Local 125 as the exclusive representative of said employees; (4) that between May 1, 1937, and June 26, 1937, petitioner had discharged and refused to reinstate 89 employees because of their membership and activities in the Union; (5) that petitioner dominated and interfered with the formation and administration of the Commercial Shoe Workers Organization, and contributed financial support to it; and (6) that on or about June 29, 1937, petitioner had discharged 103 employees because they refused to join said Commercial Shoe Workers Organization.

The Company's answer denied these charges. Hearing was had before a trial examiner on the issues thus presented, and on October 18, 1937, the trial examiner filed his report, finding petitioner guilty of unfair labor practices as charged. Thereafter, exceptions were filed to this report and a hearing had thereon before the Board on December 15, 1937. The Board took the matter under advisement until November 23, 1938, at which time it rendered its decision, finding the Company guilty as charged in the complaint, and entered its order to cease and desist from the unfair labor practices and (a) to offer to the employees against whom discrimination was found to have been practiced, immediate and full reinstatement to their positions without prejudice; (b) to make whole the employees for any loss of pay they may have suffered by reason of the discrimination against them; (c) to withdraw all recognition from the C.S.W.O. and completely disestablish it; (d) to cease giving effect to its contract with the C.S.W.O.; (e) upon request, to bargain collectively with the Union as the exclusive representative of the production and maintenance employees at its Hambro plant; (f) to post appropriate notices; and (g) to notify the Regional Director of its compliance therewith.

The United Shoe Workers of America, Local 125, referred to in the record as the Union, intervened below.

As grounds for reversal of the order of the Board, petitioner urges that: (1) the Board erred in finding that the petitioner dominated or interfered with the C.S.W.O., or contributed to its support; (2) the Board erred in ordering reinstatement of employees, with back pay; (3) the Board erred in ordering petitioner, upon request, to bargain collectively with the Union as the exclusive representative of its employees for the purpose of collective bargaining.

1. The petitioner is a Missouri corporation, with its principal executive offices in St. Louis, Missouri. It is engaged in the manufacture of shoes, and has four plants in operation, the one here involved being located at Union, Missouri, where petitioner employed approximately 700 persons.

In January, 1937, there was a short strike in the heel and edge department and the finishing department, which was settled March 15, 1937, by a promise of a general increase in wages throughout the plant. On March 30, 1937, another strike occurred over wages, which ended April 14, 1937. On April 3, 1937, Percy Turner, general representative of the United Shoe Workers of America, in St. Louis, visited at Union, talked with some of the striking employees, and offered to assist them in connection with the strike. On April 8, 1937, the Company obtained an injunction limiting picketing. The plant reopened, and on April 14, 1937, the strike was called off on an agreement to reinstate all strikers, to dismiss the injunction proceedings, and consider grievances of employees individually. On May 1, 1937, sixteen employees of the petitioner went to St. Louis, where they signed applications for membership in United Shoe Workers of America, and applied for a charter for a local at the Hambro plant. They began circulating application cards among the employees of the Company, and by May 17, 1937, had enrolled a majority of the Company's employees. Percy Turner then called upon Luke E. Hart, President and General Manager of the Company, and requested an appointment for a Union bargaining committee. Hart objected to the committee on the ground that none of them was an employee of the Company, all of the members of the committee having theretofore been discharged, except Turner, who had never been an employee. He also questioned Turner's claim of a majority representation and requested a list of Union members as proof of the claim. This Turner refused to submit because of the wholesale discharges which were taking place in the plant, but offered to prove the Union's majority in a consent election to be held by the Board. Hart refused to meet with the committee unless a list of the Union members was submitted to him.

On May 28, 1937, counsel for the Union wrote to the Company, stating that it represented a majority of the Company's employees, and requested it to bargain with the committee. Hart, by letter of June 1st, again refused to consider the request unless the Union submitted a list of its employees.

About June 1st, 1937, the C.S.W.O. began to take form. Ludy Niebrugge, employed in the City of Union as a bread salesman and who also did some work for a local newspaper, became interested in the labor questions involved and caused to be prepared and circulated among the employees of the Company "loyalty cards," which read as follows: "I, the undersigned, am not interested in a shoe workers' Union, for the Hambro factory, sponsored and controlled by men living outside of Union, Mo. I want to continue working in the Hambro Factory. If, in the future, questions should arise concerning wages and hours of labor, I would prefer the questions being settled by men and women who are employees of the Hambro Factory."

When the signers of these cards reached an impressive number, Niebrugge and his associates decided to organize an independent union. On June 22, 1937, he printed cards naming a committee of eleven to represent the employees in bargaining with petitioner. These were circulated among signers of loyalty cards, and at eight o'clock the following morning the group presented themselves to Jannings, the plant superintendent, claiming to have 200 members. When Jannings was told of their intent to organize the plant, he replied, "Well, I can't stop you." He made an appointment for them with Mr. Hart. During the next two days the circulation of the cards was completed, much of it during working hours. On June 25, 1937, Hart and his brother appeared at the factory and negotiated a contract with the committee, which then chose the name Commercial Shoe Workers Organization. The group had 351 signed cards, which was over 50% of the employees. After some dispute over the closed shop, a contract was signed which contained provision that none but members of the C.S.W.O. should be employed. The contract contained no provision concerning wages nor hours. Pursuant to this contract, the Company then notified its employees that only members of the C.S.W.O. would thereafter be employed, and in consequence about 100 employees did not return to work on June 29th.

In considering the charges of the Company's domination, interference with and contribution to the support of the C.S.W.O., we review the record to determine whether the findings of the Board are supported by substantial evidence such as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

The salient facts are here stated with that rule in mind. In the course of the April strike, a meeting of employees was held at the court house, at which Hart and Jannings spoke. Hart said that if people in Union did not want to work they would move the plant elsewhere, and Jannings declared that the employees did not need people from St. Louis to organize a union. This was indicative of a mental attitude and may be considered in connection with subsequent acts. The loyalty cards which were circulated among the employees contained an implication that unless the employees associated in a union satisfactory to the Company, they would lose their jobs. There was evidence that these cards were quite openly circulated and signed in the shop. Certain supervisory employees expressed interest and approbation in this movement. Viola Copeland, a supervisor in the cutting department, was observed distributing cards; foreman Rowland was heard to ask an employee, "How many did you get this morning?" The answer was, "I got nine—I believe that will be about all we can get on those white cards," and Rowland answered, "Oh, they will all be glad to sign them when they get hungry." Forelady Ekey told an employee, "You have got a lot of nerve telling those girls they are darned fools for signing those cards. * * * I didn't think that you would be against me." Foreman Dehne had a conversation in which he told Edgar Hults that he could keep him on his job if he would sign a card. Statements and activities of various other employees appear in the record, but they did not, we think, have such authority as would make their statements or activities binding on the Company. Ballston-Stillwater Knitting Co., Inc. v. National Labor Relations Board, 2 Cir., 98 F.2d 758; National Labor Relations Board v. Sands Mfg. Co., 59 S.Ct. 508, 83 L.Ed. ——.

As has been observed, after the loyalty cards were circulated, cards designating the committee as bargaining agency were circulated. Forelady Ekey urged one person to join the C.S.W.O. in connection with a conversation about the committee, and in conversation with another worker she said: "I had either to sign it or get out, I could take my damned Union and get out of there."

The apparent ease and facility with which the committee and Hart entered into the contract for a closed shop with C.S. W.O., and the omission from the contract of any provision relating to hours, are circumstances which we think reasonably warranted the Board in drawing an inference adverse to the Company. The discharge of six members of the Union during the period between the commencement of agitation and the movement looking toward the establishment of the local in affiliation with the C.I.O., and the consummation of the plan to organize a company union, is relied upon by the Board as further evidence of the Company's hostility to the Union and its domination of the company union. Manifestly, an employer may give support and comfort to a particular group of its employees by pursuing a policy of discharging those who refuse to join that group, or who join a rival, obnoxious to the employer.

The discharges of these six members of the Union are treated separately in the briefs. The Company relies upon the fact that May and June are slack months in the shoe business, and that these discharges were but the normal result of the decrease in the volume of business in those months. In some cases other facts are relied upon. This claim of the Company, under the particular circumstances here disclosed, is not persuasive. Of the 659 workers in the Company's employ on May 15, 1937, between 51 and 55% were members of the Union, but the discharges from the period April 29 through June 26, 1937, showed a ratio of Union members discharged to non-Union members discharged, of 3 to 1. Of the fifteen charter members of the Union, thirteen, including all the officers, were discharged during this period, and the remaining two were forced out upon the signing of the closed shop contract. For several years the employees had engaged in a system of sharing available work during the slack periods by "taking turns about." This system, however, was abruptly abandoned in May 1937, and the Company has offered no explanation for this change in its policy.

On May 3, 1937, Jannings summoned five of the sixteen employees who had been at St. Louis to apply for a charter for a local in the C.I.O. and a sixth who had been active in the strike, to his office and summarily discharged them. Jannings told two of them that they were discharged "for the benefit of the community and the Hamilton-Brown Shoe Company." The uniform practice had theretofore been to have foremen handle discharges. Two foremen testified that it was considered that if the Company got rid of these men, the trouble would be over. As to these employees, the Company contends that they were discharged because they were talking during working hours and going to other departments and interfering with good order. It also contends that three of these men were discharged for drinking, and one for fighting, but this argument is not very convincing. The drinking occurred at a Christmas party four months prior to the discharge, and the fighting occurred in 1932 and 1936, and the Board may reasonably have doubted that these acts should, in May, 1937, become reasons for discharge, especially as they were not mentioned as such at the time of discharge. As to some of the employees, there is evidence that when discharged, they were told it was because of Union membership.

The Board found that these employees were discharged because of their labor organization activities, and leadership in the promotion of the local, and this finding, we think, is supported by substantial evidence.

There was a great deal of other testimony to the effect that those in a position of authority, including the superintendent and foreman, made statements intended to discourage the employees from associating with the Union. These statements included threats to close the factory if unionization were accomplished, the threat of loss of employment and other financial loss, and the loss of their local investments, if Local 125 were formed.

On this branch of the case, we conclude that the Board's findings that the petitioner dominated, controlled, and supported the C.S.W.O. have substantial support in the evidence. National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97; Clover Fork Coal Co. v. National Labor Relations Board, 6 Cir.,

97 F.2d 331; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951; Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745, opinion filed March 27, 1939; Wilson & Co. v. National Labor Relations Board, 8 Cir., 103 F.2d 243, opinion filed April 12, 1939.

■ 2. As the C.S.W.O. was not a valid labor organization, the contract which the Company made with it was void, and the Board properly so determined. It is also clear in view of the foregoing, that the discharge of employees who refused to join the C.S.W.O. was illegal, and the Board properly reinstated them to their positions. The discharge of the other employees was likewise unlawful, and the Board was warranted in ordering their reinstatement.

■ 3. In Cudahy Packing Co. v. National Labor Relations Board, supra, we held that a provision of the Board's order to disestablish a company union which had been organized under the domination and with the support of the employer, was so indefinite that it should not have been included in the order, and that while the Board properly required the company to cease and desist from recognizing the company union, yet we required that the notice to be posted by the company should include a statement that the order "does not restrict, but is intended to protect the right of the employes freely to join or not join any labor organization or to form or not to form hereafter a local organization of their own." [102 F.2d 753]. This requirement was made so that the employees might not get the impression that it was useless for them to attempt an independent organization.

The Board here urges that the Company is guilty of more flagrant and vicious conduct than was true of the employer in the Cudahy case. The right of the employees to form an independent union and to be so advised of that right, should not, we think, be dependent upon the degree of coercion or persuasion the employer may previously have exerted in the formation of such a union. The proclaimed policy of the Act is to safeguard the rights of self-organization and collective bargaining. National Labor Relations Board v. Fansteel Metallurgical Corp., 59 S.Ct. 490, 83 L.Ed. ——. Under the law, there should be guaranteed to the employees the absolute free-

dom of choice, and that freedom should not be controlled nor influenced in any way by any expression or form of order coming from the Board or from this Court. What is said in the Cudahy case with reference to the use of the word "disestablish" is here affirmed and will be followed and applied, and such provision stricken from the order, and the same form of notice prescribed in that case will be required here.

■ 4. The Company, by a further assignment of error, challenges the propriety of the action of the Board in denying the petition of the Boot and Shoe Workers Union and Local 176 of that Union, to be recognized as the representative of the employees. A petition for a review of that part of the order denying the request of the Boot and Shoe Workers Union and Local 176 to be so recognized also presents the same question. Did the Board properly refuse such request, and if not, what, if any, procedure should be taken to establish the proper representative of the employees?

In August, 1938, before any decision had been handed down by the Board, the Boot and Shoe Workers Union wrote a letter to the Regional Director of the National Labor Relations Board at St. Louis, Missouri, advising her that a large majority of the employees of the Company had become affiliated with Local 176. Later, a formal petition was filed, asking for a hearing on the question of representation, and the Regional Director stated that this had been referred to the Board at Washington. On October 20, 1938, prior to the filing of the decision and order, another petition was filed which was again ignored until the Board issued its decision and order over a month later.

In its decision, the Board stated as its reason for dismissing the petition that, "Since the purpose of any order which may be entered in this case will be to restore the status quo as it existed prior to the unfair labor practices, any change in the identity of the representation of a majority since that time is immaterial."

The question presented is whether the Board erred in denying the petition to intervene and to reopen the record and to take further evidence on the issue of whether Local 176 represented a majority of the employees of the Company. If, as alleged in the petition of the Boot and Shoe Workers Union and Local 176, and which stands without denial, it represents over 90% of

the employees of the Company, it is directly contrary to the express provision of the Act to compel the Company to continue to bargain exclusively with the Union. Sections 7, 9(a) and 8(5), 29 U.S.C.A. §§ 157, 159(a), 158(5). The Board does not seriously deny this, but it admits that the preference of the employees as to their representatives may have altered, and may hereafter change, and that if this transfer of affiliation is freely made, it must be respected both by the Company and by the Board. It urges, however, that the restoration of conditions permitting this freedom of choice requires as a necessary prerequisite the remedying by the employer of all of its unfair labor practices, and that until the effect of those practices have been dissipated, a genuine new choice cannot be made.

But in order to restore the status quo, it is not essential that the employer should be required to recognize the C.I.O. as the agency for the employees for collective bargaining. It appears that before the hearing was closed, 90% of the employees had transferred their affiliation from the C.I.O. to the Boot and Shoe Workers Union affiliated with the A. F. of L.

Section 10(d) of the Act, 29 U.S.C.A. § 160(d), provides that, "Until a transcript of the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it."

The Supreme Court, in Consolidated Edison Co. v. National Labor Relations Board, supra, held that the refusal of the Board to permit the employers to adduce certain additional testimony which could have been received without undue delay, was unreasonable and arbitrary. Having in mind that it is the fundamental policy of the Act to permit employees freely to choose their representatives, it follows that the employees have a right to change their choice, and when that fact has been brought sharply to the attention of the Board, as in this case, it was, we think, the duty of the Board to investigate the claim.

It is more than a year and a half since the hearing was held before the Board. Prior to the filing of the transcript, a showing was made that the Union no longer represented a majority of the employees, but that 90% of them had transferred their affiliation to the Boot and Shoe Workers Union and Local 176. Yet the Board arbitrarily refused to consider or investigate this claim, but entered its order requiring the employer to recognize the Union as the exclusive bargaining representative of the employees.

In National Labor Relations Board v. Remington Rand, 2 Cir., 94 F.2d 862, 869, the Board had ordered the employer to deal exclusively with a joint board which had brought the unfair labor practice charges involved in that case. A considerable period had elapsed between the hearing and the decision, and the court directed the Board to take into consideration the fact of the lapse of time and that new circumstances may have arisen and that the employees may have changed their minds. In the course of the opinion it is there said: "Section I(d), insofar as it merely compels the respondent to treat with the Joint Board, is within the language of section 8(5), 29 U.S.C.A. § 158(5) and was plainly warranted. However, that was nearly two years ago, and it is possible that the Joint Board will no longer represent a majority of the men, even after those who struck are restored to their jobs, as later sections of the order provide. The membership of a union is constantly changing and it may at any time cease to represent the majority; if it does, it loses its power to bargain for the unit. When the authority of the representatives is in doubt, the Board must inquire and certify under section 9(c), 29 U.S.C.A. § 159(c), that their authority exists, or its order will be without support in the evidence. In the case at bar we could not in any event judge of the Joint Board's continued authority until the old men are reinstated, which the Labor Board has required—lawfully as we shall show later; and even after that has been done, it will still be impossible to judge, for not only will there have been many changes in personnel, but the men may not be of the same mind."

In National Labor Relations Board v. Fansteel Metallurgical Corporation, supra, the Board had ordered the employer to deal exclusively with the Union which had brought the charges. The Supreme Court required the Board to take into consideration the change in circumstances which affected representation. Among other things, the court said [59 S.Ct. 499]: "The Board's

order properly requires respondent to desist from interfering in any manner with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing. But it is a different matter to require respondent to treat Lodge 66 in the altered circumstances as such a representative. If it is contended that Lodge 66 is the choice of the employees, the Board has abundant authority to settle the question by requiring an election."

 So, in the instant case, the Board, after giving effect to its order to restore the status quo by reinstating the employees wrongfully discharged, and by disestablishing the company union, and requiring the employer to cease and desist from recognizing such union as a bargaining agency, should settle the question as to representation by requiring an election. We are of the view that it would be arbitrary and unfair, and not in keeping with either the letter or the spirit of the Act, to require the employer and its employees to conduct their negotiations through an agency not fairly representing a majority of the employees. In the face of the record as it stands, it can not be assumed that the Union is now the accredited representative of the employees, but the showing made, and it stands without dispute, is at least sufficient to require investigation and to cause a court of equity to inquire whether an order requiring both the employer and the employees to recognize the Union as the bargaining agency should be enforced in the face of circumstances making such enforcement unwise, if not illegal. A court of equity will not do useless, unjust, or inequitable things. In re Hawkins Mortgage Co., 7 Cir., 45 F. 2d 937. Courts do not deal with abstractions. The proceedings here are substantially proceedings in equity in that equitable rules are applicable. National Labor Relations Board v. Cherry Cotton Mills, 5 Cir., 98 F.2d 444. This court is granted power to modify orders of the Board (Section 10[f]).

We conclude that the order should be modified in two particulars: (1) the notice required to be posted should be amended by adding a statement to the effect that the order "does not restrict but is intended to protect the right of the employees freely to join or not to join any labor organization or to form or not to form hereafter a local organization of their own;" (2) that part of the order requiring the Company

to recognize only the Union as the bargaining agency of the employees is set aside and the Board directed to determine the choice of the employees by requiring an election after the status quo shall have been restored by disestablishing the company union and by the reinstatement of the wrongfully discharged employees. After the Board shall have determined the issue of representation by the holding of an election, it will then issue a certificate certifying an exclusive bargaining representative under Section 9(c) of the Act, and enter such supplemental order or orders as may be necessary to enforce such certification. As so modified, the order is affirmed and its enforcement granted, and the case is remanded to the Board for further proceedings consistent herewith.