**UNITED STATES v. NELSON.**
No. 11201.

Circuit Court of Appeals, Eighth Circuit.
March 14, 1939.

Keith L. Seegmiller, Atty., Department of Justice, of Washington, D. C. (Clinton R. Barry, U. S. Atty., of Fort Smith, Ark., G. W. Hendricks, Sp. Asst. to U. S. Atty., of Little Rock, Ark., Julius C. Martin, Director, Bureau of War Risk Litigation, of

516

Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C., on the brief), for the United States.

Charles I. Evans, of Booneville, Ark. (Jeptha A. Evans, of Booneville, Ark., on the brief), for appellee.

Before GARDNER and THOMAS, Circuit Judges, and REEVES, District Judge.

REEVES, District Judge.

From a judgment for plaintiff on a policy of war risk insurance the government has appealed. The policy was in the face amount of $10,000, and contained the usual provision for the. payment of $57.50 per month in the event of the total and permanent disability of the insured while the policy was in force.

Asserting that he became totally and permanently disabled from sundry ailments while the policy was in force, the plaintiff, on October 6, 1932, filed suit for the benefits promised. Issue was joined by an answer containing a denial of such alleged disability.

The appellee enlisted for army service May 11, 1917, and was discharged April 26, 1919. The policy sued on was granted him shortly after his enlistment and expired for non-payment of premiums on June 1, 1919.

While engaged as a soldier on the battle front in 1918 he was exposed to and injured by mustard gas on three different occasions. That he suffered serious effects from these injuries is not questioned, although, when discharged from the army, it was certified that he was suffering no disabilities because of his experience. The appellee testified that he did no work after his return from the service because he was sick and was unable to do manual labor.

In the spring of 1920 he attempted to farm, but sold his crop because he said he was unable to attend to it. The next year he had a "truck patch" and chickens, and then after that, entered vocational training at Fayetteville, Arkansas. This was in 1922, and he continued institutional and project training till 1926 when he again returned to farming, and "tried that a couple of years, and had to quit that, with the health I had."

In 1929, his brother-in-law obtained employment for him as a laborer in an extra gang on the railroad. He quit that work in 1930 and said "from then on I haven't done anything."

Before joining the army the appellee farmed and worked on railroads. The appellee said that: "At no time since June or July, 1918, when I was gassed have I been able to follow any continuously gainful occupation. Have tried but just wasn't physically able to do it. I couldn't work. * * * Am not qualified to do any kind of work except manual labor or farm work. * * * When doing manual labor it affects me. My heart runs away with me."

On cross-examination the appellee said that at times he was able "to do truck work and light work on the farm." He said: "Well some times I do, but I don't feel like it, but I have had it to do. We couldn't starve to death."

As a part of the appellee's cross-examination, the government introduced sundry documentary exhibits which had been identified by the appellee. On May 5, 1920, the appellee signed an application for compensation which he accompanied with a letter of the same date. He then stated he had been farming since March, 1920, and was still working. He fixed his wages at $35 per month. A subsequent and supplemental application was executed by him on December 17, 1920. In this application he said he had farmed since March 20, 1920, and was still doing light work. He was married on March 20, 1920. Such documents further confirm the testimony of the appellee that he took vocational training at Fayetteville, Arkansas, from 1922 to 1924. During the two years he was a student at Fayetteville the government paid him at the rate of $150 per month. This compensation continued for eight months after his student days at Fayetteville. He then took government project training on a farm and during that period received $130 per month. It appeared that his institutional training was preparatory to project training which he received up until the year 1926.

After the end of his institutional and project training, which covered a period of four years, he farmed for two years, and then for a short period worked as a laborer for the railroad. While he worked for the railroad the work assigned to him was light work, such as "keeping the tools up, flagging, carrying water, and things like that." Appellee did no heavy work, but drew the same wages as the other men. After he had worked for the railroad in

1929 or 1930, appellee supported his family by a small compensation allowed him by the government and from the products of truck patches attended to in part by himself.

On January 18, 1924, the appellee signed an application for reinstatement of his insurance wherein he said that he was not then totally and permanently disabled. He said in his testimony that he did not know of the disability benefits promised in his insurance policy until informed by some one a day or two before he made his claim. No policy was in fact issued to him.

On June 22, 1928, the government, upon the application of the appellee, reimbursed him in the sum of $2.65 for loss of wages occasioned by reporting for a physical examination.

Medical testimony offered by the appellee was chiefly that of Dr. N. E. Armstrong, who began treating the appellee in October, 1919. This witness diagnosed his trouble then as mitral regurgitation and a valvular condition of the heart. The witness also attended him in the summer of 1920, and thereafter, at intervals, except during the time the appellee was taking vocational training at Fayetteville. These attentions continued until about two years before the trial. The witness expressed the opinion that the plaintiff was totally disabled from doing manual labor at the time of the numerous examinations made by him.

As a part of the testimony of this medical witness the government introduced several statements previously made by him. On May 10, 1922, the witness signed a statement wherein he estimated appellee's disability at 33⅓%. Such an estimate was justified by the witness as follows: "At that time there was always the prospect or hope of prospect of a man recovering from such condition to the point that he is able to go ahead and do manual labor to a certain per cent." He said that his estimate was in accordance with a proper prognosis at the time. The witness identified another statement made by him on May 9, 1927, wherein he fixed the degree of disability as "40 or 50%." Again, on October 6, 1929, he thought the disability was 50%. The witness said that he was hopeful of recovery until early in the year 1933. At that time he said, in reference to appellee's ailments: "He had had it a sufficient length of time that I wasn't justified in hoping for complete recovery like I was justified in hoping for in 1919, '20, '21 or even '22. That is the reason that my statements conflict as to his ability to do manual labor."

Another medical witness who examined the appellee the day before he testified at the trial expressed the opinion that he was then totally disabled to do manual labor "at that time."

The witnesses for appellant supported its theory that the appellee did not become totally and permanently disabled while the policy of insurance was in force.

At the conclusion of the trial both parties submitted requests for findings of fact and conclusions of law. On behalf of the appellee the court found: "That at a time when said contract of war insurance was in full force and effect the plaintiff became totally and permanently disabled," and hence declared as a matter of law that he was entitled to recover.

The trial court refused a finding for the appellant, in part as follows: "Insured was not permanently and totally disabled at the time said insurance lapsed for non-payment of premiums," and declined to declare that the "plaintiff is not entitled to recover in this action."

 The question for review, therefore, is whether, on the evidence, the trial court should have found the issues for the appellee. In considering this question, this court must assume as established all the facts tending to support the claim and there should be drawn in favor of appellee all the inferences fairly deducible from such facts. Lumbra v. United States, 290 U.S. 551, loc. cit. 553, 54 S.Ct. 272, 78 L.Ed. 492; Gunning v. Cooley, 281 U.S. 90, loc. cit. 94, 50 S.Ct. 231, 74 L.Ed. 720.

 It is not the function of this court to weigh the evidence, but to determine whether the judgment is supported by substantial testimony.

Other facts will be stated as they may become pertinent in the course of the opinion.

 1. Counsel for the appellee urges in limine that the right to review was not properly preserved in the trial. The record shows that "the trial before the court was concluded on the 24th day of June, 1937 * * * it was understood that requests for findings of fact and declarations of law might be filed at a later date, and this was done."

On February 16, 1938, requests for findings of fact and conclusions of law were

submitted and filed by both parties. Such requests were considered and marked as given or refused on that date by the trial judge.

In the case of Century Indemnity Co. v. Nelson, 303 U.S. 213, 58 S.Ct. 531, 533, 82 L.Ed. 755, the Supreme Court considered an almost identical question. In approving the procedure, the court said: "It is not necessary in the circumstances to treat the first order for judgment (June 1.) as ending 'the progress of the trial.' All counsel and the presiding judge seem, rightly we think, to have entertained a wholly different view and to have acted accordingly."

2. The evidence of the appellee that upon his return from the army he was unable to work was a mere conclusion and has no probative force. He said that he was sick, but this in itself will not support a conclusion that he was totally and permanently disabled. Contrary to these statements, appellee testified on cross-examination that he did some farm work about the time of his marriage in 1920, and thereafter made statements to the effect that he was actually engaged in farm work. It was his opinion then that his disability was only partial. This was confirmed by the circumstances that for two years he took institutional training at Fayetteville, Arkansas, during which time he was paid $150 per month. These facts do not comport with his statement on direct examination that he was sick and unable to work.

Following the two years spent by him as a student, he continued to draw $150 per month for eight months on project training. For more than a year thereafter he was paid $130 a month on project training. His training was followed by farming operations. At this time he acted largely in a supervisory capacity, although he did some manual labor. One of his lay witnesses said that he carried on extensive farming operations, although he did not see him personally do any work.

In the case of United States v. Spaulding, 293 U.S. 498, loc. cit. 505, 55 S.Ct. 273, loc. cit. 276, 79 L.Ed. 617, the Supreme Court followed the rule previously announced in Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492, as follows: "But it is plain that work done may be such as conclusively to negative total permanent disability at an earlier time."

Prior to his enlistment in the army, appellee had worked on the farm and for the railroad. In either the year 1929 or 1930 he said that he worked for the railroad as a laborer and drew the same wages as the other employees engaged with him, although the appellee's assignments were to lighter tasks.

The physician who treated the appellee beginning in October, 1919, from time to time gave a favorable prognosis, as evidenced by his several statements, until 1933. In other words, he did not believe at that time that the appellee was permanently and totally disabled. His last opinion was retrospective and was contrary to the prospective opinions of prognoses previously expressed by him. While of course it is permissible to give weight to subsequent conditions and findings insofar as such conditions and findings may tend to shed light on an earlier condition, yet this medical witness did not assign any reason for changing his original viewpoint.

The interpretation of the policy as promulgated by the Treasury Department was to the effect that: "Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

The diagnoses made by appellee's medical witness disclosed well known and easily understood conditions. The witness neither found that such conditions caused a total disability, nor did he believe that they were reasonably certain to continue without improvement throughout the life of the insured.

It must be concluded that, as stated in United States v. Spaulding, supra, loc. cit. 506, 55 S.Ct. loc. cit. 276: "The medical opinions that respondent became totally and permanently disabled before his policy lapsed are without weight. * * * Moreover, that question is not to be resolved by opinion evidence."

The situation here presented was aptly covered in Burbage v. United States, 5 Cir., 80 F.2d 683, loc. cit. 684, wherein the court said: "The insurmountable obstacle to appellant's recovery is his two years' work studying law, from 1924 to 1926."

The fact of his vocational training over so long a period is inconsistent with the theory of total and permanent disability. Blair v. United States, 8 Cir., 47 F.2d 109; United States v. La Favor et al., 9 Cir.,

96 F.2d 425; O'Quinn v. United States, 5 Cir., 70 F.2d 599.

It follows from the foregoing that the judgment should be reversed, and it is so ordered.