## CUDAHY PACKING CO. v. NATIONAL LABOR RELATIONS BOARD.
### No. 452.

Circuit Court of Appeals, Eighth Circuit.
Dec. 18, 1940.

Rehearing Denied Jan. 10, 1941.

John S. Sears, of Sioux City, Iowa (Thomas Creigh, of Chicago, Ill., on the brief), for petitioner.

Samuel Edes, of Washington, D. C., Atty., National Labor Relations Board (Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, Laurence A. Knapp, Asst. Gen. Counsel, National Labor Relations Board, and Louis Libbin, all of Washington, D. C., Atty., National Labor Relations Board, on the brief), for respondent.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

COLLET, District Judge.

Petition for review of an order of the National Labor Relations Board. This Court has jurisdiction under Section 10, National Labor Relations Act, 29 U.S.C.A. § 160.

Petitioner, the Cudahy Packing Company, referred to hereafter as the Pack-

ing Company, operates a packing plant at Sioux City, Iowa, where livestock is slaughtered and meat processed for consumption. Upon charges theretofore filed by United Packing House Workers Local Industrial Union No. 389, the National Labor Relations Board, hereafter referred to as the Board, issued its formal complaint June 28, 1938, charging the Packing Company with unfair labor practices in that it had dominated and interfered with the formation and administration of the Packing House Workers Union of Sioux City (referred to hereinafter as the Independent Union), and had contributed financially to that Union, and that certain employees, nine in number, had been discriminated against because of their membership in the United Packing House Workers Local Industrial Union No. 389 affiliated with the Committee for Industrial Organization. Some confusion may be avoided by reference hereafter to the latter union as C.I.O. No. 389. The Independent Union was allowed to intervene and the complaint was heard. During the hearing, on motion of the Packing Company, the charge of discrimination as to two of the employees was dismissed. This action was later affirmed by the Board. On, August 31, 1938, the Trial Examiner filed an Intermediate Report finding the Packing Company guilty of (1) domination of and interference with the Independent Union and (2) of discrimination with reference to the employment of two of the seven remaining employees named in the complaint. No discrimination was found by the Trial Examiner with reference to the other five employees named in the complaint. He recommended the dismissal of the complaint as to these five men.

September 9, 1938, the United Packing House Workers Local Industrial Union No. 873, also affiliated with the Committee for Industrial Organization and which will for convenience be referred to as C.I.O. No. 873, filed a petition asserting the existence of a representation controversy at the Sioux City plant and requesting an investigation and certification as provided in Section 9 of the National Labor Relations Act, 29 U.S.C.A. § 159. The Board ordered the investigation and consolidated that inquiry with the pending unfair practice case, without notice to the Packing Company. Objections of the Packing Company to the consolidation being later overruled, it answered and a hearing was held November 21–23, 1938 on that petition. May 11, 1939, the Board heard oral arguments in the consolidated case and on September 26, 1939, issued its final decision in which it found that the Packing Company had been guilty of unfair labor practices in dominating and interfering with the Independent Union and in discrimination with reference to the employment of six employees, four of whom the Trial Examiner had found there had been no unfair discrimination against. The Board found there had been no unfair discrimination as to the other employee named.

The Board ordered the discontinuance of the domination and interference with the Independent Union, the disestablishment of that union, offer of restoration of employment and seniority rights to the six employees, with compensation for their net loss in wages from the date of receipt of the Trial Examiner's intermediate report, the repayment to governmental agencies of money paid employees improperly discharged for "work relief", the discontinuance of recognition of the Independent Union as the bargaining agent for the Packing Company's employees, prohibited discouraging membership in C.I.O. Union No. 389 or any other labor organization of its employees, or in any manner interfering with, restraining or coercing its employees in the exercise of their rights under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. It was further ordered that the Packing Company immediately post in its plant and keep posted for a period of sixty days notices of compliance with the Board's order, and that it notify the Regional Director in writing within ten days what steps had been taken to comply with the order. The Board further ordered an election by secret ballot for the purpose of ascertaining whether the Packing Company's employees at its Sioux City plant desired to be represented by C.I.O. Union No. 873.

The Packing Company advances seventy-six grounds for reversal, all of which may be summarized as follows:

(1) There was no competent substantial evidence to support the Board's finding of domination of and interference with the Independent Union or any union.

(2) That there is no competent substantial evidence of unfair discrimination against any of its employees.

(3) That the order requires the Packing Company to abrogate its written contract with the Independent Union.

(4) The order directing an election by secret ballot is improper because C.I.O. No. 873 ceased to exist February 10, 1939, and it was not shown that any appreciable number of the Packing Company's employees belonged to that Union or authorized the filing of a petition for certification.

(5) The complaint upon which the order was based was issued upon charges made by C.I.O. No. 389, the membership of which included employees of other packing companies.

(6) C.I.O. No. 389 surrendered its charter August 10, 1938, with the result that the issues raised by the complaint have become moot.

(7) The Packing Company was not afforded a fair and impartial trial by reason of the prejudice of the Trial Examiner.

(8) That the Board improperly refused to give evidentiary weight to certain affidavits attached to the Company's answer.

(9) That the Board had no authority to order the Company to refund to governmental agencies money paid by such agencies for work relief to employees unlawfully discharged by the Company.

These questions will be considered in the order stated.

█ While the burden is upon the Board to sustain its findings, it is entitled to the benefit of all reasonable inferences supporting its findings (Cupples Co. Manufacturers v. National Labor R. Board, 8 Cir., 106 F.2d 100, 102), hence the facts will be stated in the aspect most favorable to the Board. Neither the Company nor the Intervener offered evidence at the hearing.

On the question of domination and interference with the Independent Union the record discloses that for several years prior to April 12, 1937, Petitioner and its employees had negotiated through a Conference Board composed of an equal number of management and employee representatives. April 12, 1937, the opinion of the Supreme Court upholding the constitutionality of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was announced. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. A few days later Petitioner's Superintendent announced that it would be necessary to discontinue the Conference Board. Immediately thereafter a meeting described by witnesses as a secret meeting attended by fourteen employees including three former Conference Board members was held at which the preliminary organization of the Independent Union was consummated. Members for the new union were solicited during working hours in the presence of company officials with plant foremen advocating membership therein. May 1st, the Petitioner was notified that the Independent Union represented over 51 per cent of the employees. May 4th, Petitioner recognized the new union as the exclusive collective bargaining agent. At that time the organization of the Independent was not yet complete. May 15th, a convention of all independent unions formed at each of Petitioner's plants was held at Omaha, Nebraska. Petitioner was represented there by its President and other representatives. At that convention a blanket form of contract for use at all of Petitioner's plants was agreed upon and later, after discussion by the Independent, adopted, and on June 14, 1937, executed. Petitions for amendment of the contract were signed at the direction of plant foremen, dues were collected for membership in the Independent Union at the plant during working hours, activity on behalf of other unions was prohibited at the plant, and employees were advised by plant officials to have nothing to do with any other union.

█ From this and other testimony, less significant, the Board found participation in the formation of and domination over the Independent Union. It is not the province of this Court to weigh the evidence and determine the accuracy of the Board's finding of fact. Cudahy Packing Co. v. National Labor Relations Board, Packing House Workers' Union of St. Paul, Intervener, 8 Cir., 102 F.2d 745. We may only determine whether the record presents substantial evidence supporting those findings and reverse the Board's order in the event of an absence thereof. Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49. The facts presented constitute sufficient grounds upon which the Board could reach the conclusion arrived at. Cudahy Packing Co. v. National Labor Relations Board, supra.

Was there substantial evidence of unfair discrimination against the six em-

ployees who were ordered reinstated by the Board?

■ Lester Nelson was employed from 1929 until April, 1936. He discontinued his employment from April, 1936, until August of that year on account of poor health. He was again employed from August until December, 1936, when he was laid off because of meager livestock receipts. He returned to work in September, 1937, and continued until December 4, 1937, when he was again laid off. From December 10, 1937, until May, 1938, he was employed intermittently for very short periods in departments other than the beef-kill department where he had always worked formerly. He has had no seniority rights in any department in which he has been employed since October 4, 1937. Nelson joined the C.I.O. Union December 3, 1937. He appeared at work wearing a C.I.O. button the next day. The Board based its conclusion that Nelson had been discriminated against an account of his C.I.O. affiliations on the following evidentiary facts appearing in the record: That he was laid off the same day he first appeared wearing a C.I.O. button; that he was the only man laid off in that department that day; that the Company contended that he was laid off on account of light livestock receipts when the evidence showed Nelson's department was operating on December 4th at the rate of eighty head of cattle per hour; that lay-offs did not ordinarily occur in that department on account of meager livestock receipts until operations dropped to the rate of sixty per hour; that on December 15th, one of the days Nelson unsuccessfully applied for reinstatement, that department was operating at a rate of one hundred head per hour, with fifteen additional employees hired on that date, all of whom were younger in point of service than Nelson. That his employment subsequent to December 4, 1937, in other departments for short periods entitled him to no seniority rights, the loss of which operated as a substantial disadvantage to him. There is no evidence in the record that Nelson had been active in union affairs, no evidence that his union affiliations were known to the Company unless his C.I.O. button gave it such notice. There is no evidence of any hostility toward Nelson on account of union affiliations or for other reasons. The record does not disclose any disagreement or discussion with his superintendent or others concerning his union membership. While this record might lead one to suspect that Nelson may have been discharged because of his union affiliations, or stating the situation in the language of counsel for the Board: "If it were true that livestock receipts were light on December 4th, it is curious that Nelson should be the only employee laid off on that date," yet it is well recognized that mere suspicion or conjecture alone will not afford a proper basis for a finding of fact. Cupples Co. v. National Labor Relations Board, 8 Cir., 106 F.2d 100.

■ It is not necessary in establishing a necessary fact by circumstantial evidence that a party upon whom the burden of proof rests shall present evidence to dispel all contradictory inferences. It is necessary, however, that such party produce evidence of facts and circumstances which may be accepted by the trier of the fact as establishing with reasonable certainty the truth of the inference contended for. Bieser v. Goran, 340 Mo. 354, 100 S. W.2d 897. In this instance it was unnecessary that the Board produce evidence disproving the possibility that Nelson was discharged on account of light receipts and was not re-employed because of a lack of seniority rights, but it was necessary that there be evidence of facts and circumstances from which the Board could conclude with reasonable certainty that he was discharged because of his union affiliations. In our judgment the evidence fails to meet the legal requirements noted.

■ The Board concluded that the discharge of Otto Boyd was because of his membership in the C.I.O. It based that conclusion on evidence of the following facts: Boyd had been employed by the Company for approximately eleven years. He joined the C.I.O. December 1, 1937, and commenced wearing his C.I.O. button at the plant December 5, 1937. On Saturday morning December 18, 1937, he telephoned a message to his department to be given his foreman, Johnson, stating that he would be unable to work that day because of illness. Absences under such circumstances violated no rule of the Company. When he reported for work the following Monday he was refused permission to work by Johnson, the only explanation being a statement by the latter—"You have taken Saturday off on yourself, take today off on me." Johnson was openly hostile to the C.I.O. Boyd was active in soliciting membership for the C.I.O. He re-

turned the next day, December 21st, but was sent home by Johnson with instructions to remain there until called. Boyd obtained work in another department from the 7th to 18th of January, 1938, but was discharged on the latter date because he could not keep up with his part of the work in that department. He returned to the beef-kill department January 19th asking Johnson when he could report for work. Johnson told him to wait until he, Johnson, could discuss the matter with an Assistant Superintendent. A few minutes later a watchman directed Boyd to get his clothes and get out of the plant. While the facts upon which the Board based its conclusion in Boyd's case may be less convincing than in instances affecting other discharged employees, substantial evidence in support of the conclusion, reached is not wholly absent.

Preston Daniels was employed by the Company in July, 1934. He also worked in the beef-kill department under Superintendent Johnson. With the exception of brief lay-offs on account of short receipts he worked steadily until December 22, 1937. There appears to have been no complaint with his work. Mr. Johnson knew him and spoke to him as he came in in the mornings. The latter part of October, 1937, Daniels joined the C.I.O. He solicited others to join. About the 1st of December, 1937, he first wore his button to work. After that only occasionally did Johnson speak to him. He was laid off December 22d. On that day the operation of the department was reduced to sixty cattle per hour. Daniels' seniority rights had, prior to December 22d, resulted in his employment at all times when the run was as high as seventy per hour. December 24th, Daniels having heard that the run had increased to eighty per hour called Johnson to apply for reinstatement. Immediately upon being informed that it was Daniels who was calling Johnson "hung up". Daniels was employed for a short time in January, 1938, in another department where he had no seniority rights. While he was so employed the foreman solicited him to turn in his C.I.O. button. He did not do so and was later discharged. He was not employed thereafter by the Company. The Board found that Daniels' lay-off on December 22d was justified because of meager livestock receipts but found that the refusal to reinstate him on December 24th was on account of his C.I.O. affiliations. For

the same reasons heretofore noted we are not authorized to interfere with the Board's conclusion.

Alex Gongliewski had an altercation with another employee January 19, 1938. Both were immediately discharged. The other employee was reinstated a few days later. Gongliewski, although employed for two or three days in another department in January, was not reinstated to his former position until March 22, 1938. Although the evidence might well justify the conclusion that the altercation alone was the cause of his lay-off, there was positive testimony that Gongliewski's foreman, who discharged him, stated to the witness that the reason for Gongliewski's discharge was that he was endeavoring to induce the other employees to join the C.I.O. The foreman did not testify. The Board reached the conclusion that the real reason for his lay-off was his union affiliation. There was substantial evidence to support the conclusion.

Michael Mislika had been employed by the Company approximately eight years prior to December, 1937. He joined the C.I.O. late in November, 1937. Shortly before Christmas he was asked to pay his dues to the Independent Union by a member of that Union. He refused and was told that unless he did do so he would be transferred to the hog-killing department where he did not have seniority rights. Mislika stated he would pay his dues to the C.I.O. "in the morning." Immediately, the Independent representative went to the Foreman's Office. The following week Mislika worked two days. The second day he was discharged by his foreman with the statement that he was drunk the day before. There is no evidence that he was drunk. The Foreman did not testify. Later Mislika was given employment from January 8th to February 28, 1938 in the hog-killing department. Other than in certain affidavits which the Board did not consider and which will be discussed hereafter there was no explanation of these facts. The Board found that Mislika's lay-off in December, 1937, was on account of his C.I.O. affiliations. That finding will not be disturbed on this record.

Harry R. Washburn was President of the C.I.O. Local at the time of his discharge on June 28, 1938. Two days previously all C.I.O. members in the beef-killing department wore their buttons, at which time Washburn was ordered out of that

department with the statement, "Get out of here you C.I.O. son of a———". His discharge followed two days later. The record contains much additional testimony supporting the Board's conclusion that Washburn's discharge was on account of his union activities. That testimony need not be reviewed. Obviously, the Board's finding was supported by substantial evidence.

The third point urged by the Company is that the Board exceeded its authority in ordering the "disestablishment" of the Independent and the consequent abrogation of the Company's contract with the Independent.

■ The Board's authority to make the order complained of is well established. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Newport News Shipbuilding Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219. With the term "disestablish" amply defined in Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745,[1] the order is not open to the criticism now directed to it.

The Company's contention that the Board improperly directed an election for the purpose of determining the proper representatives for collective bargaining purposes is not now before us, the petition for review of that portion of the Board's order directing such an election having been heretofore dismissed for lack of jurisdiction.

The fifth ground for reversal—that the complaint upon which the Board's order was based was issued upon charges made by C.I.O. No. 389, the membership of which included employees of other packing companies—is based upon the following facts: At Sioux City, Iowa, the Armour and the Swift packing companies operate plants similar to the Company's plant. The membership of C.I.O. No. 389 was, prior to the formation of Local 873, composed of employees of all three packing companies. The complaint involved herein was filed by C.I.O. 389. After the hearing of the complaint by the Trial Examiner and before his report had been made a separate local was formed and chartered for each plant, with the members of each restricted to employees of each of the three packing companies. Local 873 was the unit composed of the Cudahy employees. No authority is cited by counsel even remotely bearing upon the subject. Evidently the contention has been abandoned.

■ Nor has this complaint case become moot merely because, as asserted, the charter for C.I.O. 389 has been surrendered. The record discloses that when a local was chartered for each of the packing companies at Sioux City, the membership of all the members of C.I.O. 389 who were employees of Cudahy were transferred to Local 873, which was, as heretofore noted, the local chartered exclusively for Cudahy employees. There has been no withdrawal of the Board's formal complaint or of the charges upon which the complaint issued. The change in the name of the organization which made the original charge has in no way altered the issues or removed the ground for the charges. Such changing circumstances do not make the Board's order moot—National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. loc. cit. 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

■ The charge that the Company has been denied a fair trial because of the prejudice of the Trial Examiner Fitzpatrick is wholly without merit. He recommended the dismissal of five of the charges of discrimination against individual employees. In its complaint of the Board's action in refusing to follow that recommendation except as to one employee, counsel commends the Trial Examiner rather highly. We fail to find where any material evidence was excluded or that his attitude was at all hostile to the Company's interests or its representatives. The assignment of error is overruled.

Complaint is made of the action of the Board in refusing to give "evidentiary weight" to certain affidavits made by officers of the Company which were attached

[1] "To clarify this term 'disestablish' so that it may intelligently be obeyed by the company and enforced by this Court (if necessary), we define it as requiring the Company not to recognize, support or encourage the further existence of this particular independent union for any purpose or in any manner." Cudahy Packing Co. v. National Labor Relations Board, supra, 102 F.2d loc. cit. 752.

to the Company's answer to the formal complaint. At the beginning of the hearing before the trial examiner the following occurred:

"* * * Are you ready, Mr. Smoot? (Counsel for the Board)

"Mr. Smoot: I ask that this document be marked as Board's Exhibit 1. * * *

"Mr. Forsling: If the Court please, I appear for the Packing House Workers Union of Sioux City, who are asking to intervene in this proceeding. When would the Court want that matter presented?

"Trial Examiner Fitzpatrick: Well, I presume now would be the proper time.

"Mr. Smoot: I would suggest, Mr. Examiner, that I be allowed to introduce the pleadings in the case before we hear the motion to intervene, if that would be all right.

"Trial Examiner Fitzpatrick: Well, that would be in correct order. I think that would be very proper.

"Mr. Smoot: I wish at this time to introduce in evidence what has been marked for identification as Board's Exhibit No 1, which is a certification by Robert Wiener, Regional Director for the Eighteenth Region, all of the pleadings in this case, with the exception of the designation of the Trial Examiner, which has not yet been received.

"Trial Examiner Fitzpatrick: Any objection?

"Mr. Creigh: May we see this?

"Mr. Smoot: Yes.

"Mr. Creigh: Mr. Smoot, I assume that the various pages in here marked 'charge', 'amended charge', and so on, are identical copies of those attached to the complaints, of which there are three?

"Mr. Smoot: Yes.

"Mr. Creigh: Upon that statement we have no objection.

"Trial Examiner Fitzpatrick: Very well. Board's Exhibit No. 1 will be admitted."

The Trial Examiner referred to statements contained in the affidavits in his report. At the oral argument before the Board the following transpired:

"Chairman Madden: Are you asking the Board to give weight to these affidavits?

"Mr. Snyder: The Trial Examiner has done so.

* * * * * * * * *

"Chairman Madden: Are you undertaking to support that method of giving testimony?

"Mr. Snyder: Well, it seems to me as a matter of an informal tribunal such as this, there might have been exception taken to the thing, and an exception well taken might have barred them out and required the production of the witness. However, I went through the trial of that myself, and I think that there was absolutely no testimony in the case which required it.

"Chairman Madden: It may be that it was not necessary to put in any testimony but I wanted to get clear on this question, and I wonder where we could find any precedent in any judicial or quasi judicial procedure for taking an affidavit of a witness in place of his testimony when he is apparently readily available, and we could see him, and we could cross-examine him.

"I suppose that there just isn't any precedent for that, is there?

"Mr. Snyder: I don't know of any and I make no point about it. * * *"

It is now the Company's contention that since the affidavits were attached to the answer and referred to therein,[2] the offer by the Board's counsel and the admission in evidence of the pleadings carried with it the offer and admission of the affidavits. It appears elsewhere in the record that the answer was used by counsel for the Board to obviate the necessity of making proof of the periods of employment of certain employees. The answer contained those admissions. The affidavits went much further and stated reasons for discharge of the employees.

■ If it be assumed that the affidavits should be considered a part of the pleadings to such an extent that they should, in the present state of the record, be treated as having been offered and admitted, and if it be further assumed that statements of facts supporting affirmative defenses and not directly germane to admissions contained in the pleadings are to be considered

2 The affidavits were referred to in following manner—"that hereto attached marked 'Exhibit A' and made a part hereof as fully as though set forth herein is the affidavit of * * * relating to the matters herein alleged."

as evidence when the pleading is offered by the adverse party (neither of which questions we now determine), inasmuch as counsel definitely and clearly conceded the affidavits should not be considered by the Board, complaint may not now be made that the Board did not consider them.

The question has been given the position of prominence it occupies because of the fact that the Board, by statutory authority,[3] may and oftentimes does receive hearsay testimony. What will constitute an abuse of this statutory authorization must be determined in the light of the peculiar facts of a case in which the question is properly presented, but it would seem rather obvious that hearsay in the form of written affidavits should be given as much evidentiary weight as parol testimony of a witness to the effect that some one told him certain people had a secret meeting to organize a company union. If the latter class of hearsay is to be received proper fairness would suggest that the former also be considered.

The Board ordered the Company to reinstate certain employees with back pay and directed the deduction from those payments of the amounts they had received for work performed upon "work relief projects". These latter amounts were ordered paid over to the governmental agencies which had made the payments for the work relief.

The recent opinion of the Supreme Court in Republic Steel Corp. v. National Labor Relations Board, 61 S.Ct. 77, 85 L.Ed. ——, decided November 12, 1940, necessitates the revision of the Board's order by the elimination therefrom of the following: "* * * and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, County, municipal, or other government or governments which supplied the funds for said work relief projects."

The order of the Board should be modified eliminating the order for the reinstatement of Lester Nelson and eliminating that part of the order quoted above relating to reimbursements to governmental agencies. As so modified the order is affirmed and an order of compliance therewith is ordered to be issued.

[3] 29 U.S.C.A. § 160, subsection (b): "* * * In any such proceeding the rules of evidence prevailing in courts of law or equity shall not be controlling."