NATIONAL LABOR RELATIONS BOARD v. AMERICAN PEARL BUTTON CO. et al.

No. 12971.

Circuit Court of Appeals, Eighth Circuit.

May 8, 1945.

Stephen M. Reynolds, Atty., National Labor Relations Board, of Minneapolis, Minn. (Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, and Winthrop A. Johns and Irene Shriber, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Roscoe P. Thoma, of Fairfield, Iowa, for respondent American Pearl Button Co.

Richard A. Stewart, of Washington, Iowa (Carlton C. Wilson, of Washington, Iowa, on the brief), for respondent Washington Chamber of Commerce.

Before GARDNER, THOMAS, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge, delivered the opinion of the Court.

The National Labor Relations Board seeks enforcement of its order in which it found the American Pearl Button Company and the Washington Chamber of Commerce, of Washington, Iowa, jointly and severally guilty of unfair labor practices within the meaning of Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1). The complaint, prompted by charges by the Amalgamated Clothing Workers of America, C.I.O., alleged substantially: (1) That the American Pearl Button Company and Washington Chamber of Commerce, named as respondents, jointly and severally by their officers and agents, from on or about March 9, 1943, to the date of the issuance of the complaint, made and caused to be published and circulated derogatory and disparaging statements about unions and union leaders; warned and discouraged employees of the Button Company against affiliation with or activities on behalf of the Amalgamated Clothing Workers' Union; questioned employees concerning their union activities and solicited them to resign from the union; and (2) that by said acts they jointly and severally interfered with, restrained and coerced their employees in the exercise of the rights guaranteed in Section 6 of the Act, 29 U.S.C.A. § 156. The complaint specifically alleged that the Chamber of Commerce was an employer of the Button

Company's employees within the meaning of Section 2 of the Act, 29 U.S.C.A. § 152.

On hearing before a trial examiner he made his intermediate report, finding that the Company had engaged in unfair labor practices as alleged, but that the Chamber of Commerce had not engaged in such practices. He recommended that the complaint be dismissed as to the Chamber of Commerce and that a cease and desist order be entered against the Button Company. On review before the Board the findings, conclusions, and recommendations of the trial examiner, so far as they affected the Button Company, were adopted and approved. The findings relative to the Chamber of Commerce and the recommendation that the complaint be dismissed as to it, however, were disapproved by the Board and by its findings it held the Chamber of Commerce guilty of the unfair labor practices found to have been indulged in by the Button Company. Each respondent filed a separate answer and each was represented by separate counsel; each has separately appealed, being represented by separate counsel in this court. Both the respondents resist the enforcement of the cease and desist order and ask that the decision and order entered by the Board be set aside. We shall first consider the contention of the Button Company.

In resisting enforcement of the order the Button Company contends: (1) That the complained of statements of its president do not constitute interference, restraint or coercion of its employees in the exercise of the rights guaranteed them by the National Labor Relations Act, and do not constitute a violation of Section 8(1) of the Act; (2) that there is no substantial evidence justifying the conclusion of the Board that the Company restrained, coerced or interfered with its employees in exercising their rights under the National Labor Relations Act; (3) that the complained of statements of the Company's minor supervisory employees Bey, Murdock, Burham, Brown and Enslin, do not as a matter of law constitute "interference, restraint or coercion" by the Company of its employees, nor do these statements constitute substantial evidence sufficient to justify a conclusion of "interference, restraint or coercion" by the Company; (4) that the Company was not responsible for the conduct or statements of its employee John Blodgett because he was not a supervisory employee;

that in any event the statements and conduct of said Blodgett did not constitute "interference, restraint or coercion" by the Company of its employees.

No authorized bargaining unit has ever been established in respondent's plant at Washington, Iowa, and there has never been a contract of employment between respondent and its employees. In February, 1943, the Amalgamated Clothing Workers of America, C.I.O., which will hereafter be referred to as the Union, began its efforts to organize the Company's employees. In March, 1943, the Union's requested recognition as bargaining representative was declined, following which the Union and the respondent Company agreed to the holding of an election under the supervision of the National Labor Relations Board for the purpose of determining the Union's majority status. The election was held April 9, 1943, the majority voting against naming the Union as the bargaining representative of the employees. The acts of unfair labor practice charged are those occurring during the campaign which preceded this election.

The Button Company is an Iowa corporation, with its principal place of business at Washington, Iowa, where it is engaged in the manufacture and sale and distribution of pearl buttons. There was evidence tending to show that during the time the Union was engaged in organizing the employees of the Company, and prior to the election for the purpose of determining whether the Union should be chosen as the bargaining agent for the employees, Carl Jungbluth, president and general manager of the Company, in conference with a committee of the cutting department of the Company, stated that if the Union were successful in getting into the plant the hours would be reduced to forty hours a week, and there would be no more overtime. He told Mr. Wilson, a member of the cutters' committee that he had three or four buyers for his shells, the material from which the Company manufactured buttons; that the Company was making only nominal profits and if demands were made upon the Company which would preclude its making a profit that "the only recourse then would be to sell their shells and blanks to competitors and eventually even close down because we could not run and could not afford to run without a profit." On another occasion he asked an employee who called at his office whether she had attended the Union meeting on the previous night, saying that he "wanted to find out the straight of some things that was going around." He also asked her if any of the other girls had gone to the Union meeting. He also said: "Mr. Schultheis (the Union organizer) told you that I couldn't go to 40 hours. I can too. I can go to ten hours if I want to." He also said he did not have to continue working fifty hours, forty hours, or thirty hours, or "even run at all if conditions don't warrant it, or if we don't see fit to do so."

Foreman Bey, during this same period, in answer to advice from an employee that she had signed an application for membership in the Union, said: "What did you want to do that for? Don't you think this company has been treating you pretty good around here? Mr. Jungbluth didn't tell me this—I read between the lines—they might even close this plant down;" that she would make less money if the Union came into the plant. Bey also said to another employee, in answer to an inquiry as to why he took 168 buttons for the test instead of 144; "This is where your damn Union comes in." He also said that he did not want the Union in the plant; that if it got in all the employees would be looking for other jobs; that Jungbluth said if the Union got in the plant he would "shut the damn factory down." In a later conversation, after the election but just prior to the hearing, the same employee said to Mr. Bey that she was going to testify and tell what he had said to her about the Union; that he had replied then, "It's going to be too bad for you." Foreman Bey had a conversation with another employee with reference to an increase in the number of buttons required, to which Bey replied: "That's what this Union is going to do for you—you ought to know, you have been to every one of the meetings."

Foreman Murdock, in conversation with an employee about the price of buttons, in which the employee said there ought to be more money for the smaller shells, replied: "Well, after you get your Union in here it will be cut down, forty hours a week. Maybe we will both be out of a job for good." At a later time, Murdock said to this employee, referring to the organizer of the Union: "After that guy sells you what he wants to sell you, why, he will up and quit you. That's the way he makes his living." Another employee in conversation with foreman Murdock was told: "Bob, I

don't believe button cutters can hold together in the Union. I've been in a Union before and they have never stuck together. * * * If the Union comes in Bob, you won't be making as much money as you are. I will be making the same but I will have more time to go fishing and work in the garden, but yours will not be the same and you will not have any overtime and the shop will go to forty hours." To another employee, Murdock said that if the Union came in the plant the hours would be reduced to forty hours, to which the employee replied: "If they reduce the hours they will be discriminating against the Union." Murdock then said: "Well, then, they will shut it down. Carl Jungbluth told me they would." A few days before the election, foreman Murdock told another employee that if the Union won the election the Company would cancel the employees' insurance and would also stop selling coal to the employees at cost price.

Mr. Burham, foreman of one of the departments of the Button Company, said to an employee the day before the election, "If this thing goes through you will have to get a new foreman because I won't work in here and have any woman show me how to run this place." To another employee he said substantially the same thing.

Mr. Brown, superintendent of the plant, said to an employee that he "should know how to vote to keep the company going." Later, Mr. Brown went to the home of the same employee and said that he "should know how to vote to have a job."

Mr. Enslin, foreman of the sorting department, at the time he posted notice of the election in the sorting room remarked before the employees there employed: "Well, we may all be going on a vacation some of these days, sitting on a river bank fishing. It isn't all gold that glitters."

There was other evidence relative to statements by supervisory officers indicating a general hostility to the Union, but this we have not embodied because such statements did not carry with them any threat of reprisal or economic loss to the employees.

■ It is contended by the Company that certain of the parties named as foremen were not supervisory officers. We think, however, the record sustains the finding of the Board that they acted in such supervisory capacity as to impress the employees that they represented the views of the management. National Labor Relations Board v. Thompson Products, 6 Cir., 130 F.2d 363; International Ass'n of Machinists, etc. v. National Labor Relations Board, 311 U. S. 72, 61 S.Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368.

■ It is urged that the statements were within the right and privilege of the individuals making them under the constitutional guaranty of free speech. While an employer may express his opinion on the merits of labor organization controversies and may indicate a preference for individual dealings with the employees, yet the right of free speech in labor matters can not properly be exercised so as to coerce the will of the employees. N. L. R. B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556. As said by the Supreme Court in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 326:

■ ■ "Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Decisions of other courts have done likewise. When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. Cf. National Labor Relations Board v. Virginia Electric & Power Co., supra. But short of that limit the employer's freedom can not be impaired. The Constitution protects no less the employees' converse right. Of course espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause. It is entitled to the same protection."

■ The statements found by the Board to have been made by the Company's representatives, considered in view of all the facts and circumstances disclosed by the record, tended to interfere, restrain or coerce the employees, and we cannot say that this finding of the Board was not sustained by substantial evidence. The Board is a fact finding body, and while some of the incidents may seem to be unimportant, there was room for an inference that the Company unlawfully interfered with the organizational activities of the employees. National Labor Relations Board v. Cape County Milling Co., 8 Cir., 140 F.2d 543,

152 A.L.R. 144; National Labor Relations Board v. Nevada Consolidated Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. The Board was warranted in inferring that the Company threatened to shut down operations in the event the election was favorable to the Union. It was warranted in inferring that if the Union were successful the management would at least so manipulate the hours of service that the employees would receive less compensation than they had received, or that the plant would close and they would be without employment, also that insurance benefits and coal purchasing privileges would be withdrawn. These acts constituted improper interference on the part of the employer with the employees' rights of self organization. Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49; National Labor Relations Board v. Blanton Co., 8 Cir., 121 F.2d 564; National Labor Relations Board v. Pacific Gas & Electric Co., 9 Cir., 118 F.2d 780.

It remains to consider the case against the Chamber of Commerce. The trial examiner found that it had not interfered with, restrained, nor coerced the employees of the Company in the exercise of their rights guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. The Board, however, found that the activities of the Chamber of Commerce interfered with, restrained and coerced the employees of the Company in the exercise of these rights.

The Chamber of Commerce is a nonprofit corporation, organized under the laws of Iowa. It is governed by a board of directors; has a president and a secretary, and keeps records of all its proceedings. During the Union's campaign for membership, preceding the election, the board of directors of the Chamber of Commerce held a meeting to discuss the report alleged to have been circulated by the Union that the pearl button manufacturers at Muscatine, Iowa, were paying higher wages than the company at Washington. At this meeting a committee was appointed to investigate the facts and to publish them "as they find them" in the local newspaper. The editor of the local newspaper was appointed on that committee. The Board called the secretary of the Chamber of Commerce as a witness, proved that he kept minutes of the meetings of the Chamber of Commerce in a book which he produced. He identified the minutes of two separate meetings, one held April 3, 1943, and the other April 5, 1943. He explained that the meeting of April 3 was a board meeting, and the meeting of April 5 was a general meeting, attended by members generally. The minutes of the meeting of April 3 read as follows:

"A Called meeting of the directors of the Washington Chamber of Commerce met at the Secretary's office at 9:00 a. m. to discuss the matter of propaganda concerning a difference in wages paid by the American Pearl Button Company and the button companies at Muscatine which have been circulated by the representatives of the Amalgamated Clothers workers of America. (C. I. O.)

"A motion by Mr. Logan and seconded by Mr. Mace that the President appoint a committee to gather the facts regarding what salaries are being paid by the American Pearl Button Company and also the salaries being paid by the button factory at Muscatine. Motion carried.

"President Tucker appointed a committee to notify the business and professional men to attend their April meeting on Monday evening, April 5, at 7:30.

"The special committee of President Tucker's, R. E. Shannon and L. C. Willits, were to advertise the facts as they find them in the Evening Journal.

"There being no other business, the meeting adjourned."

Minutes of the meeting of April 5, verified by the secretary, and introduced by the Board, read as follows:

"The April meeting of the Washington Chamber of Commerce met at the Y. M. C. A. at 7:30. President Tucker presiding.

"The meeting was called for the purpose of formulating plans to inform the citizens of the community of the facts regarding the wages paid by the American Pearl Button Company compared with those paid by the button companies in Muscatine, according to schedule received from Muscatine, we find that the American Pearl Button Company is paying higher wages in most lines of work, which was contrary to propaganda which was circulated by the Amalgamated Clothing workers of America (C. I. O.)

"After much discussion, a motion by W. L. Rukgaber and seconded by I. Rothchild, was made that a full page ad be run in the Evening Journal at the expense of the Chamber of Commerce.

"There being no other business, the meeting adjourned."

The advertisement authorized by the Chamber of Commerce was identified and offered in evidence by the Board. It was published in the Evening Journal and reads as follows:

"To the Employees of the American Pearl Button Company

"The office of the Washington Chamber of Commerce is reliably informed that an election will be held by your group on Friday, April 9, 1943, to determine whether or not the C. I. O. is to be delegated to act as your bargaining agent. This message to you is prompted only by a desire for fair play, and to bring to public attention certain information which should have a bearing upon your decision Friday. That decision, of course, lies entirely in your hands, as it should.

"Committee Conducts Investigation

"Through the efforts of the Chamber of Commerce the wage scales of several Pearl Button Manufacturers, now under C. I. O. contracts in Muscatine, were investigated and compared with the wage schedules of the American Pearl Button Company here at Washington. The following facts were established:

"1. Wages in the Cutting Department were found to vary so greatly, because of the numerous types and sizes of shell and different methods of cutting, that it was difficult to get direct comparisons. A new scale of cutting wage we learn has been presented by the American Pearl Button Company to the War Labor Relations Board for approval. As nearly as can be determined, this scale is on a par with the cutting scale of most finishing plants at Muscatine.

"2. In Other Departments, where direct comparisons could be made, it was found that wages paid by the American Pearl Button Company were, with the exception of one Company, as high as other Companies were paying. In most cases they are higher. In fact, the comparisons are distinctly in favor of the local Company.

"3. Working Hours at the Muscatine finishing plants, it was found, are largely restricted to 40 hours a week. The majority of American Pearl Button Company employees work 50 hours a week or more, with time and a half for overtime. The lowest scale of pay here is 40¢ per hour, or $16.00 per week. With 50 hours of working time, however, the employees earn at least $22.00 per week. With earnings above the minimum the overtime factor, of course, is of still greater importance. Working hours are not governed by law, neither is the right of an owner to operate or not operate his plant.

"4. The Weekly Payrolls of the American Pearl Button Company are now averaging approximately $7,500.00, of which about $6,000.00 is paid at Washington.

"Statements, therefore, that these local wage rates are lower than the average rates in the industry, we find, are untrue. Also, it should be remembered that These Rates Are Frozen by Law and can not be changed or adjusted except by appeal to the War Labor Board.

"The Chamber of Commerce is deeply interested in the American Pearl Button plant as a community institution. You, as employees of the enterprise, constitute an extremely important part of this community's citizenship, therefore your welfare is closely related to the welfare of Washington.

"Be Sure to Vote!

"Since you have been asked for a decision in the matter of C. I. O. membership, it is very important that each of you vote. 51% of the votes cast will determine the election (not 51% of the total number of employees.) Failure to vote, therefore, is in reality a vote for the union. The ballot will be secret and you have the right to vote as you wish. The Chamber of Commerce urges that you exercise that right, voting exactly as you please. You are not bound by anything you may have signed, or by any statement you may have made.

"This Important Decision is in Your Hands!

"Washington Chamber of Commerce."

The Chamber of Commerce is in the nature of a quasi public corporation, consisting of business and professional men and other citizens of Washington, Iowa, interested in local civic improvements and the general welfare of the business community. The Button Company has no interest nor control over the Chamber of Commerce, nor does the Chamber of Commerce have any connection with or financial interest in the Company nor any voice in the conduct of its business or the formula-

tion of its business policies. It has no authority to hire or fire an employee or to raise or lower his wages. It has no power of discipline and no power over working conditions at the Company's establishment. The president of the Company is not a member of the Chamber of Commerce. The Chamber of Commerce by its published statement was disseminating the information secured by its committee relative to the rumor that the Company was paying lower wages than its competitors at Muscatine. It urged all the employees to vote at the election so that the result might reflect the sentiment of a majority of the employees. It dealt with the facts of the controversy which fell within the area of free discussion as guaranteed by the Constitution. Both the rights of assembly and of discussion are protected by the First Amendment. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Thomas v. Collins, supra. Surely, as liberal a rule should be applied where the accused is not in fact an employer but is charged with acting in the interests of an employer. Nothing in the display advertisement was coercive or threatening, and, as we have observed, the Chamber of Commerce had no power to inflict reprisals, and this, we must assume, was well known by all the employees of the Company. There is no claim that so far as it purports to give any facts it misstated such facts, and there is nothing in this advertisement that might not with impunity, under the constitutional guaranty of freedom of speech, have been published in the press, preached from the pulpit, proclaimed on the public streets, or shouted from the housetops of the City of Washington. As said by Mr. Justice Rutledge for the Supreme Court in Thomas v. Collins, supra, referring to the constitutional guaranty of free speech:

"The right is a national right, federally guaranteed. There is some modicum of freedom of thought, speech and assembly which all citizens of the Republic may exercise throughout its length and breadth, which no State, nor all together, nor the Nation itself, can prohibit, restrain or impede."

Again, it is said in that case:

"The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly."

It is claimed that other or further action was taken by the Chamber of Commerce at its meeting of April 5th. As to this it is observed that the Board itself produced and offered in evidence the minutes of the proceedings of this corporation without qualification or reservation. They were the best evidence of the proceedings taken at the meeting. Columbus Outdoor Advertising Co. v. Harris, 6 Cir., 127 F.2d 38; Simpkinson v. Commissioner of Internal Revenue, 5 Cir., 89 F.2d 397 (reversed on other grounds, 93 F.2d 1015); Buffalo Trust Co. v. Producers' Exchange, 224 Mo.App. 199, 23 S.W.2d 644. No attempt was made to impeach them, nor to impeach the testimony of the secretary who recorded the minutes. The minutes of April 5th made recital that, "There being no other business, the meeting adjourned." Certain witnesses were asked with reference to the discussion had at the meeting, but the important thing so far as the Chamber of Commerce is concerned, is not what the discussion was, but what action was taken. Whether individual members of the Chamber of Commerce, after the adjournment of the meeting, may have had further discussion, or even entered into some tacit understanding, would not be binding upon the Chamber of Commerce. Such action would be the responsibility of those who participated in it. What the opinion of such individuals might be as to the action taken can not be accepted in face of the unimpeached record as to what proceedings were in fact had. This record showed not only what proceedings were had but that no other proceedings were had. Snell Isle v. Commissioner of Internal Revenue, 5 Cir., 90 F.2d 481; Goldsworthy v. Anderson, 92 Colo. 446, 21 P.2d 718, 87 A.L.R. 1396; Jenkins v. Tanner, Tex.Civ.App., 166 S.W. 2d 167. An opinion not supported by facts does not reach the dignity of evidence. United States v. Nelson, 8 Cir., 102 F.2d 515; Everglades Drainage Dist. v. Florida Ranch & Dairy Corporation, 5 Cir., 74 F. 2d 914. The Board's findings must be supported by substantial evidence. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 116 F.2d 367; Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 112 F.2d 545. In so far as these findings refer to the nature and effect of the activities of the

Chamber of Commerce, they are not sustained by substantial evidence.

The cease and desist order will be enforced as to the respondent American Pearl Button Company, but will not be enforced as against the respondent Chamber of Commerce.

JOHNSEN, Circuit Judge (concurring).

I merely wish to add an observation or two on the Board's finding that the Chamber of Commerce had acted in the interest of the Button Company and had thus put itself in the position of "employer" under section 2(2) of the National Labor Relations Act,[1] 29 U.S.C.A. § 152(2), and that it therefore should be held to have interfered with, restrained, and coerced the Company's employees in their right of self-organization.

The Board said that "the Chamber of Commerce engaged in a *parallel* campaign to dissuade employees of the Company from voting for the Union" [emphasis mine]; that "the activities of the Chamber of Commerce were motivated by its opposition to the Union"; and that "the actions of [those members of the Chamber who had suggested to employees of the Button Company that it was to the best interest of the community to keep the Union out] were taken upon direction by, and are attributable to, the Chamber of Commerce."

The Board, however, did not purport to find that the activities of the Chamber of Commerce were instigated by the Company; or that the Chamber had made any agreement or alliance with the Company to become part of its subject forces; or that the Chamber had any relationship to or interest in the Company, other than as a community institution—such as might by legal attribution or imputation have made it the mere mouthpiece of the Company; or that the Chamber had assumed to make reprisive threats, such as, for example, that its members might refuse to hire any of the employees in their various businesses, if the Union election carried and the Company closed its plant; or that the advertisement of the Chamber and the expressions of its members did not represent statements of actual fact or of honest belief.

That the Chamber of Commerce was opposed to unionism, that it had some of its members suggest to employees of the Button Company that the interest of the community would be best served by voting against the Union in the plant election, and that it published an advertisement declaring that it was interested in the button plant as a community institution and had investigated its wage scale in comparison with other button plants and that the statements being made that the wages of the local plant were below the average in the industry were untrue, might warrant the Board in finding that the Chamber was acting in the interest of the employer, within the meaning of section 2(2) of the Act, but it would not follow from this, without more, that the Board was entitled to hold that the Chamber was guilty of illegal interference, restraint and coercion in the employees' right of self-organization.

I do not have any doubt that expressions of hostility to union organization made by an employer to his employees, for the purpose of influencing their vote in a plant election, may, in the economic hold of a particular employment field or of some immediate plant situation, amount to an improper interference with, and restraint and coercion of, the right of self-organization. But I have no less certainty of conviction that such expressions made by a third party, who is not shown by the evidence to have any legal identity with the employer, or to possess a separate coercive hold upon the employees, or, where such a hold exists, to have attempted to exercise it, as by threats, express or implied, of capable reprisal, cannot broadly or loosely be branded as illegal interference, restraint, or coercion.

The pendency of a local labor dispute cannot be made to impose a legal gag upon the community. Nor can the members of the community be prevented from making expressions upon the issue because they choose to take sides. It is when speech has a purpose that the right is the most valuable and its protection the most important. Probably only because men have been interested in the questions that surround them, and because they have been free to air their inner stirrings upon the issues which such questions present, and because they have believed that it was important that their voice be made heard, has American life survived.

---

[1] § 2(2). "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly * * *."

Unions, Chambers of Commerce, and every other group, all have the right to criticize, with fair expression, the position of each other, both generally and in some particular situation. I should suspect that the expression of one economic group probably is without much effect upon the members of another, where there is no hold of immediate relationship between them, and I should doubt that the Chamber of Commerce's advertisement and the anti-union expressions of its members could have had much, if any, influence on the Button Company's employees in the present situation. But, whether it did or not, the mere fact that it might have tended to influence the employees would not of itself make it illegal interference, restraint, or coercion. It would not in my judgment constitute illegal interference, restraint, or coercion, unless the influence was such as to impinge, through physical, moral or economic fears, upon the employees' ability to make a free choice. On the record before us, there is no basis for holding that the Chamber of Commerce had any such hold or that any of these fears did or could arise from what it said and did.

Encroachment upon the right of free expression of the members of one group is a potential threat of encroachment upon the right of the members of another. Labor least of all can afford the risk of any such potential threat, no matter how slight or remote it may seem.